

FILED

DEC 3 2013

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **Solaria Corporation**<br>6200 Paseo Padre Parkway<br>Fremont, CA 94555<br><br>and<br><br>**Solaria India Private Limited**<br>202 SSH Pride<br>Plot 273, Road 78<br>**Jubilee Hills**<br>Hyderabad, AP 500096, India<br><br>Plaintiffs,<br><br>vs.<br><br>**United States**<br>acting through the<br>**Overseas Private Investment<br>Corporation**<br>1100 New York Avenue, N.W.<br>Washington, D.C. 20527-0001<br><br>Defendant | Count I: Failure to pay appropriate termination for convenience costs<br><br>Count II: Tort of fraud committed in performance of the Commitment Letter contract<br><br>Count III: Breach of Contract<br><br>Count IV: Breach of implied-in-fact contract<br><br>Count V: Implied-in-fact equitable estoppel<br><br>Count VI: Breach of duty of good faith & fair dealing<br><br>Count VII: Declaratory Relief<br><br>Count VIII: Bad faith denial |

13-949 C

## COMPLAINT FOR FAILURE TO PAY APPROPRIATE TERMINATION FOR CONVENIENCE COSTS, BAD FAITH DENIAL AND RELATED CLAIMS

Solaria Corporation and Solaria India Private Limited,

Plaintiff, by its attorney, Michael J. Trevelline, sues Overseas

Private Investment Corporation Defendant, and states:

**Parties & Jurisdiction**

    1.   Plaintiff Solaria Corporation is a Delaware corporation

doing business in California.

    2.   Plaintiff Solaria India Private Limited is a corporation of

the country of India doing business in India.

3.   Plaintiffs meet the eligibility requirements for attorney's fees recover under the Equal Access to Justice Act, 28 U.S.C. § 2412, and so shall if they prevail.

4.   The defendant ("OPIC") is an agency of the United States government located in Washington, D.C.

5.   This Court has jurisdiction over these parties and these matters pursuant to 28 U.S.C. § 1491(a)(1) and the Contract Disputes Act, 41 U.S.C. § 601 et seq. (the CDA).

6.   This is an appeal from a deemed denial of a termination proposal submitted in July 2013, attached as **Exhibit C**.

7.   OPIC provides commercial loans that facilitate the economic and social development of less developed countries under 22 U.S.C. § 2191.

8.   Pursuant to 22 U.S.C. § 2199 (d) "Powers of Corporation," OPIC may "sue and be sued in its corporate name ... ."

9.   The Court of Federal Claims has exclusive jurisdiction over such contract-based claims against OPIC. *Optiperu, S.A. v. Overseas Private Investment Corp.*, 640 F. Supp. 420, 424-426 (D.D.C. 1986).

**Solaria & India Project**

10.  Plaintiff Solaria Corporation manufactures and sells solar panels.

11.  Plaintiff Solaria India Private Limited is a subsidiary of

--2--

Solaria Corporation and has solar panels produced in India.
Throughout this complaint Plaintiff Solaria Corporation and
Plaintiff Solaria India Private Limited will be referred to in the
singular as Plaintiff or Solaria, unless otherwise designated.

12.  Solaria possesses years of substantial experience in the
production and sale of solar panels and the financing thereof and
produces solar panels using proven technology.

13.  In or about 2010, Solaria mapped out a plan to
undertake increased production of solar panels in India through
the Indian subsidiary, hereinafter referred to as the India Project.

14.  Solaria developed a detailed and viable business plan for
the India Project, including production, product standards and
quality, marketing and sales, finance.

15.  The financial aspect of the Indian Project consisted of
first raising equity financing and then debt financing.

16.  In or about 2011, Solaria presented its Indian Project to
equity investors and quickly raised in excess of $30 million since its
plan was so well conceived.

**Solaria-OPIC October 2010 to April 2011 discussions &
negotiations**

17.  When raising this $30 million in equity, Solaria
approached OPIC about the possibility of providing the debt
financing portion of the Indian Project.

18.  In approximately October 2010, Solaria started to discuss
with OPIC the funding of such a project.

19. OPIC reacted positively to the proposal.

20. The Indian Project was so well conceived that Solaria could have obtained the needed $30 million in debt financing from any number of lenders.

21. At all times mention in this Complaint, OPIC was aware that Solaria could have obtained debt financing from other lenders.

22. However, to obtain such alternative debt financing would have approximately six months since a lender of such an amount of money must undertake a documented analysis of the loan.

23. At all times mentioned in the Complaint, OPIC was aware that Solaria's ability to obtain alternative financing declined rapidly as Solaria invested its equity in the India Project.

24. At all times mentioned in this Complaint, OPIC was aware that it would take multiple months for another lender to provide the loan.

25. In late 2011 through on or about September 2012, OPIC knew that it would become more and more difficult for Solaria to obtain financing from another lender as Solaria invested more and more of its equity capital in the India Project in lieu of debt capital, which previously OPIC had represented would be available in late 2011 or early 2012.

26. In late 2011 through on or about September 2012, OPIC was aware that Solaria would suffer the extensive losses detailed below if OPIC reneged on its promise to provide the $30 million

--4--

loan as agreed since the time to obtain alternative financing was so long (two to three months) and since such financing becomes more and more difficult to obtain as equity financing is depleted.

27. In or about April 2011, OPIC and Solaria negotiated the language of a commitment letter with the goal of OPIC providing $30 million in debt financing for the India Project.

28. The draft they arrived at in April was substantially the same as the one eventually signed.

**June-September 2011 due diligence investigation**

29. After completing these negotiations in April, OPIC began a due diligence investigation in June 2011 completing it in September 2011.

30. This due diligence investigation was extensive and exhaustive so that no further due diligence needed to be conducted after it was finished.

31. This due diligence investigation of OPIC was completed by 29 September 2011, apart from monitoring whether Solaria (1) had made any requested changes (¶ 23(j) of the Commitment Letter Annex), (2) had met production metrics(¶¶ 23.f and 24.d of the Commitment Letter Annex), (3) had passed a review by an independent engineering firm (¶ 23(o) of the Commitment Letter Annex), and (4) had passed a review by an independent marketing consultant (¶ 23(p) of the Commitment Letter Annex).

32. Solaria did provide the extensive documentation requested in the months following the issuance of the Commitment

Letter.

33. All such documentation provided did meet all the requirements of the Commitment Letter.

34. The fact that due diligence had been completed is seen in the commitment letter itself at paragraph 23 of the Summary of Terms and Conditions since all of the items labeled a through r had been accomplished, save acts of a ministerial nature, and save the later completed requirements, discussed below, of changing India manufacturers and upgrading the India capabilities.

## September 2011 Commitment Letter & OPIC's customary practice & representations

35. On 29 September 2011, OPIC and Solaria executed a Commitment Letter, attached as **Exhibit A**.

36. The Commitment Letter includes an "Annex A Summary of Terms and Conditions."

37. Both OPIC and Solaria meant the Commitment Letter to be the agreement between the parties committing OPIC to provide the $30 million in debt financing since it contained all the key terms.

38. OPIC advised that it is the practice and custom of OPIC to perform a definitive due diligence investigation before issuing a commitment letter and to treat the commitment letter as a definitive promise to provide financing.

39. As part of the due diligence investigation, OPIC sent a team lead by Lynn Tabernacki to Solaria's California offices for

several days in May 2011 to conduct a portion of the investigation.

40. Toward the end of that visit, Tabernacki stated to Solaria's staff that the results were among the smoothest and strongest that OPIC had ever had from a due diligence investigation.

41. Tabernacki stated she and her team will go back and recommend approval.

42. She said that the OPIC's process is to issue the commitment letter only after OPIC has approved the loan, that it would be only a formality for OPIC to complete the contracts and provide the financing after issuing the commitment letter.

43. Solaria's staff specifically asked Tabernacki and her team if OPIC had ever issued a commitment letter and then not approved the loan. Tabernacki and her staff responded that they had no memory of that ever happening.

44. Tabernacki and her staff said that the financing would come through in a short time after the issuance of a commitment letter, within two months.

45. The Commitment Letter by its very terms required Solaria to immediately undertake substantial financial obligations for the India Project so that the payment of termination costs were implicitly included.

46. The terms requiring Solaria to undertake these immediate financial obligations include:

01. On the Commitment Letter Annex A, at pages

--7--

bates Solaria 00020, at provision (g), requiring a 31
December 2012 working conditions report where to submit
such a report presumes the expenditure of millions of dollars
by Solaria.

02.   On the Commitment Letter Annex A, at pages
bates Solaria 00023, at provision 1.5, requiring a 31
December 2012 report where to submit this report required
Solaria to expend several million dollars in cash.

### Two committees approve

47.   On or about September 2011, Tabernacki told Solaria
that OPIC only issues commitment letters when two committees
have approved the loan: the investment committee and the credit
committee.

48.   She further said that when these committees approve a
loan, OPIC has in fact given its final approval to the loan since the
only step left is for officials to sign.

49.   On or about September 2011, Tabernacki told Solaria
that the two committees had approved Solaria's loan so that the
Commitment Letter served as a confirmation that the loan was
approved, despite the sentence in the Commitment Letter
providing an expiration date.

### OPIC requires a tier one manufacturer, upgraded India capabilities & immediate expenditures with look-back

50.   In addition, it is implicit in OPIC's Commitment Letter
demands that OPIC had committed itself to providing the $30

--8--

million loan upon issuance of the Commitment Letter since it was impossible for Solaria to execute upon the India Project without immediately expending millions of dollars in funds, funds that could only come ultimately from the loan.

51. The funds could only come ultimately from the loan since the time to obtain alternative financing was so long (approximately six months) and since such financing becomes more and more difficult to obtain as equity financing is depleted.

52. As part of its May to September 2011 due diligence investigation, OPIC had determined that it wanted Solaria to change India manufacturers from the relatively small manufacturer that Solaria was using to a tier one manufacturer that was acceptable to OPIC.

53. In the Commitment Letter, at section 21, Additional Project agreements (a) of the Annex, OPIC required Solaria to use the designated tier one manufacturer before providing the $30 million in financing and did approve Jabil Circuit, Inc. as the tier one manufacturer before providing the $30 million.

54. This switch in manufacturers ("Tier One Manufacturer") drove the cost of manufacturing each solar panel up from $120 to $160.

55. In addition to requiring a tier one manufacturer, OPIC required as a condition of the Commitment Letter that Solaria upgrade its India capabilities ("Upgraded India Capabilities"), including sales and marketing capabilities, engineering capabilities,

customer service capabilities, as seen especially in the Commitment Letter Annex at paragraphs 23.b, d, f (borrower upgrading from a 2-person sales office) and 24.d (borrower required to have sales pipeline of sales and support personnel, implicitly including the hiring of logistics and other operations support personnel).

56.  When imposing these Tier One Manufacturer and Upgraded India Capabilities requirements, OPIC was aware that it was requiring immediate compliance by Solaria.

57.  When imposing these requirements, OPIC was aware that the only way for Solaria to comply was by switching manufacturers and by augmenting capabilities.

58.  When imposing these requirements, OPIC was aware that these requirements would require the expenditure of substantial funds by Solaria.

59.  When imposing these requirements, OPIC was aware that these requirements would require Solaria to undertake an immediate sales campaign and sales commitments.

60.  When imposing these requirements, OPIC officials also told Solaria that OPIC was giving Solaria a 12-month look-back period for the costs of complying such that these requirements could be financed by the $30 million loan.

61.  The OPIC officials who made this 12-month look-back statement were Lynn Tabernacki and Michael Ratliff.

62.  They made this statement regarding the look-back cost recovery from May 2011 through August 2012.

63. In addition to making this statement orally, OPIC made this statement implicitly by approving Solaria's financial model, which included a look-back to finance these expenditures.

64. When imposing these requirements and promising the look-back, OPIC was aware that the only means of Solaria to cover the required expenses was through the $30 million loan since Solaria had decided to forego alternative debt financing and since alternative financing was no longer feasible as alleged above in ¶ 26.

**By its own terms, Commitment Letter loan obligations triggered**

65. The Commitment Letter in the Summary of Terms and Conditions section at paragraph 23 provides for conditions precedent to initial disbursement, labeled a through r.

66. All the relevant, non-ministerial conditions precedent had occurred so that by the terms of the Commitment Letter, OPIC had committed to the loan.

67. This is so since Solaria successfully (1) switched to a Tier One Manufacturer, (2) Upgraded India Capabilities, (3) provided the necessary documentation (4) had made any requested changes, (5) had met production metrics, and (6) had passed a review by an independent engineering firm.

**Continued assurances of OPIC & Solaria foregoes alternative financing**

68. From 29 September 2011 through on or about June 2012, OPIC many times assured Solaria that OPIC would provide the

*--11--*

financing as promised.

69.  Often these assurances were made by senior officials of OPIC to include Lynn Tabernacki, Michael Ratliff, James Polan.

70.  Immediately after receiving the Commitment Letter, Solaria made blanket orders for equipment with smaller initial delivery releases in order to start the India Project at the tier one contract manufacturing site.

71.  When the financing was not provided in December 2011 as anticipated, Solaria inquired of OPIC how to proceed since the timetable of the India Project contemplated the next order of equipment and commitment of funds.

72.  In effect, OPIC responded by instructing Solaria beginning in December to proceed with the India Project by expending more funds and making more financial commitments since OPIC had committed to providing the financing.

73.  OPIC's responses included the exhortation that OPIC would provide the financing even faster if Solaria made more financial commitments, demonstrated higher yields in its factory, and obtained more orders since such would confirm the viability of the India Project.

74.  In March 2012, when the financing was not yet forthcoming as promised, Solaria set up a meeting with OPIC's senior vice president, Jim Polan, to be held on Thursday 5 April at one in the afternoon at OPIC's Washington, D.C. offices.

75.  The meeting was indeed held beginning at

approximately 1:30 to 2:00 p.m. since Polan was running late.

76. In attendance at the meeting for Solaria were Daniel Shugar, CEO; Suvi Sharma, President; Robert Zapotosky, CFO; and Rana Mookerjee.

77. At the meeting, Polan in no uncertain terms assured Solaria that the deal was done, that the $30 million in financing would be provided.

78. At the meeting, Polan stated twice: "I personally guarantee this loan will be completed."

79. Polan further explained that it was not a question of a further internal decision by OPIC, but rather it was a matter of completing the paperwork and formalities to round out the package.

80. Polan apologized that Solaria's loan had taken longer to fund than it should have, that part of the problem was that Solaria's project was being run by junior and inexperienced OPIC staff, and that if necessary, he would personally engage to ensure its timely completion.

81. At the meeting Solaria explained once again its growing precarious financial situation, and Polan responded by instructing Solaria to proceed with financial commitments since the $30 million in financing would come through momentarily.

82. After the meeting with Polan on 5 April 2011, Solaria staff sent an update to Solaria's Board of Directors stating that OPIC's funding had been reassured.

--13--

83. When no funds were forthcoming in the following weeks as Polan had promised, Solaria inquired of OPIC when they would be forthcoming via Nancy Pfund, a member of Solaria's Board of Directors.

84. Pfund met with Polan in Washington DC on 10 May 2012

85. At the meeting, Polan expressed to Pfund his satisfaction that the loan was continuing to move forward, and stated that OPIC was happy with the progress and results of the India Project thus far, since Solaria had exceeded all goals set by OPIC.

86. Pfund provided the following feedback from the meeting to the Solaria Board of Directors: "I met with Jim Polan at OPIC in DC on May 10. He was very supportive to Solaria and referred to the loan as moving forward."

87. In reliance on these assurances and in light of strong customer demand, Solaria decided from December 2011 through summer 2012 to forego pursuing alternate sources of debt financing and to continue full-throttle with the India Project in complete reliance on OPIC's debt financing.

**Termination for convenience costs & proposal**

88. As stated below, in or about September 2012, OPIC cancelled the Commitment Letter contract.

89. Given the nearly sold-out state of Solaria's solar panels and Solaria's full-throttle production and marketing expenses that Solaria had incurred in complying with OPIC's demands, the

--14--

financial consequences of OPIC's sudden and unforeseen cancelation were devastating—tens of millions of dollars.

90. The damages that Solaria incurred as a result of the breach amounts to $28,673,236.81.

## Count I: Failure to pay appropriate termination for convenience costs

91. Plaintiffs repeat and reallege all of the allegations contained in all previous paragraphs as if set forth at length herein.

92. On page three of the Commitment Letter (Ex A) is provided the only five circumstances, labeled (a) through (e) (bates Solaria 00003), wherein OPIC can withdraw from its obligation to provide the $30 million in debt financing.

93. On March 28, 2012, the parties mutually agreed that the Commitment letter would expire on 31 December 2012 rather than on 30 March 2012.

94. On or about September 16, 2012, OPIC notified Solaria that it was withdrawing its commitment since at least one of these five circumstances had arisen.

95. This withdrawal of OPIC constituted a termination for convenience of the Commitment Letter contract since none of the five circumstances existed.

96. Due to the Contracting Officer's failure to issue a final decision on Plaintiff's Termination Claim within 60 days as allowed by the CDA, Plaintiff's claim is deemed denied.

97. By reason of the foregoing, Defendant is liable to

--15--

Plaintiffs for damages of $28,673,236.81.

**Count II: Tort of fraud committed in performance of the Commitment Letter contract**

98. Plaintiffs repeat and reallege all of the allegations contained in all previous paragraphs as if set forth at length herein.

99. Under the law of government contracts, the government may be held liable for the tort of misrepresentation when the "misrepresentation was connected to the performance of the written contract." *Reforestacion de Sarapiqui v. The United States*, 26 Cl. Ct. 177, 192 (1992) (emphasis omitted)(citation omitted).

100. By letter of 26 October 2012, Solaria wrote to OPIC discussing the loss that OPIC had caused Solaria by reneging on the Commitment Letter promises.

101. In a letter dated 9 November 2012 (attached as **Exhibit B**), OPIC's vice president and general counsel, Don S. De Amicis, responded to Solaria.

102. In this 9 November letter, OPIC provided the following false, contrived reasons for OPIC to withdraw from the Commitment Letter:

01. Solaria had changed its business model to expand manufacturing beyond India where OPIC knew all along of this.

02. Solaria India could not operate as a stand-alone entity where OPIC knew all along that Solaria India would primarily be a manufacturing subsidiary for Solaria. This was made clear throughout the diligence process prior to the issuance of the

Commitment Letter. Further, at OPIC's request, Solaria had built extensive stand-alone business capabilities in the India subsidiary, including sales & marketing, engineering, customer service, inter-company agreements, such that the subsidiary was a stand-alone entity for the purposes of supporting the OPIC loan.

03. Senior level debt impaired OPIC's rights where OPIC knew all along of the existence of senior level debt. This debt had been reflected in all the financial data provided to OPIC prior to its issuance of the Commitment Letter.

04. There were *unforeseen* declines in the price of Solaria's products.

103.    OPIC made these misrepresentation in order to intimidate Solaria into abandoning its claim for termination costs.

104.    It is outrageous that a government official would hide behind government employee immunity to make such misrepresentations.

105.    Upon information and belief, OPIC's motive for making such boldfaced lies is the fact that another California producer of solar panels, Solyndra, engaged in unseemly behavior and promoted unworkable technology becoming a national political point of contention. When this happened, it became likely that members of Congress would inquire into the loan made to Solaria.

106.    Upon information and belief, OPIC's staff lacked the backbone and moral fortitude to perform the work of explaining to

Congress that Solaria's technology is provable and that Solaria does not participate in unseemly behavior.

107. For that reason, OPIC asked Solaria not to publicize the Commitment Letter, whereas initially, OPIC supported its publication.

108. Upon information and belief, OPIC's staff cowered at the bad publicity and political pressure resulting from the Solydra scandal, even though having no relation to Solaria and its India Project.

109. Upon information and belief, OPIC's staff decided to renege on its agreement with Solaria so that Solaria alone would pay the price of the lack of backbone in OPIC's staff.

110. The course of conduct of the Defendant as described above was deliberately undertaken and was committed in wanton, willful, and reckless disregard of Plaintiffs' rights and was attended by malice and vindictiveness on the part of said Defendant.

111. By reason of the foregoing, Defendant is liable to Plaintiffs for damages of $28,673,236.81.

**Count III: Breach of contract**

112. Plaintiffs repeat and reallege all of the allegations contained in all previous paragraphs as if set forth at length herein.

113. It was an abuse of discretion for OPIC not to make the loan as promised where the conditions precedent contained in the Commitment Letter had all occurred.

114. Solaria has made a claim upon the Defendant to pay it

--18--

for the costs incurred in continuing with the India Project without arranging alternative financing, but Defendant has wrongfully denied its claim.  Injustice will result if Defendant does not pay Solaria.

115.   As a result, Solaria has suffered damages in the amount of $28,673,236.81.

116.   By reason of the foregoing, Defendant is liable to Plaintiffs for damages of $28,673,236.81.

### Count IV: Breach of implied-in-fact contract

117.   Plaintiffs repeat and reallege all of the allegations contained in all previous paragraphs as if set forth at length herein.

118.   Implied-in-fact means that the parties had a meeting of the minds as seen from statements and conduct, although not expressed.  Such agreements are enforceable against the government since no equity is involved.  This is also termed factual estoppel, and perhaps in some instances equitable estoppel by courts confused about the concept.  The elements are the same as those for an expressed contract:  "(1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance." *D & N Bank v. United States*, 331 F.3d 1374, 1377 (Fed. Cir. 2003).

119.   By dint of the facts and circumstances alleged above, the parties entered into on 29 September 2011 an implied-in-fact contract to make the lending of $30 million within two months under the terms outlined in the Commitment Letter Annex

irrevocable so that OPIC could not cancel the loan without terminating for convenience.

120.   Facts and circumstances supporting the existence of this implied-in-fact contract are alleged above and include especially: (1) December 2011 instructions by OPIC to proceed with the India Project since the money would be forthcoming; (2) 4 April 2012 promises of Polan to Solaria management; (3) June 2012 promises and representations of Polan to Solaria Director Pfund; (4) including terms in the Commitment Letter Annex that required the immediate expenditure of large sums by Solaria where Solaria could no longer obtain alternative financing; (5) statements by OPIC that the two committees had approved so that the deal was consummated; (6) inclusion in the Commitment Letter of conditions precedent, all of which occurred save the ministerial acts; (7) OPIC's custom of only issuing commitment letters after it had competed due diligence and made the decision to make the loan; (8) statements by Lynn Tabernacki and staff that if the Commitment Letter were issued, then the agreement was final; (9) the inclusion of a look-back provision to cover immediate expenditures by Solaria on the India Project where Solaria could no longer obtain alternative financing; (10) OPIC's knowledge that Solaria was foregoing the arrangement of an alternative loan based on the promises of OPIC and could no longer obtain alterative financing since such financing could not be obtained in time to complete the India Project and since such financing was no longer

feasible where Solaria had depleted its equity financing on the India Project.

121.    The agreement for OPIC to loan the $30 million under terms found in the September 2011 Commitment Letter without any right of OPIC to renege or to conduct further due diligence, other than review by an Independent Engineer (which Solaria would and did easily pass), constitutes an implied-in-fact contract.

122.    In reliance on these promises under the implied-in-fact contracts, Solaria went ahead with the India Project and made all the changes to the India Project that OPIC had required.

123.    In December 2011 through June 2012, OPIC offered to revise the Commitment Letter contract and the implied-in-fact contract described in the above paragraphs from a project financing contract to a typical corporate loan structure to Solaria Corporation and Solaria India, upon the condition that Solaria continue with the India Project and continue to undertake financial obligations in that project.

124.    Solaria accepted this offer to modify, creating another implied-in-fact contract under which OPIC undertook to provide the loan with one month of each of the assurances made by OPIC officers from December 2011 through June 2012.

125.    Facts and circumstances supporting the existence of this modified implied-in-fact contract are alleged above and include especially: (1) December 2011 instructions by OPIC to proceed with the India Project since the money would be

forthcoming; (2) 4 April 2012 promises of Polan to Solaria management; (3) June 2012 promises and representations of Polan to Solaria Director Pfund; (4) including terms in the Commitment Letter Annex that required the immediate expenditure of large sums by Solaria where Solaria could no longer obtain alternative financing; (5) statements by OPIC that the two committees had approved so that the deal was consummated; (6) inclusion in the Commitment Letter of conditions precedent, all of which occurred save the ministerial acts; (7) OPIC's custom of only issuing commitment letters after it had competed due diligence and made the decision to make the loan; (8) statements by Lynn Tabernacki and staff that if the Commitment Letter were issued, then the agreement was final; (9) the inclusion of a look-back provision to cover immediate expenditures by Solaria on the India Project where Solaria could no longer obtain alternative financing; (10) OPIC's knowledge that Solaria was foregoing the arrangement of an alternative loan based on the promises of OPIC and could no longer obtain alterative financing since such financing could not be obtained in time to complete the India Project and since such financing was no longer feasible where Solaria had depleted its equity financing on the India Project.

126.   In reliance on these promises, Solaria went ahead even farther with the India Project and undertook the further financial obligations that OPIC was completely aware would be necessary to continue on with the project.

127.    Solaria has made a claim upon the Defendant to pay it for the costs incurred in continuing with the India Project without arranging alternative financing, but Defendant has wrongfully denied its claim. Injustice will result if Defendant does not pay Solaria.

128.    As a result, Solaria has suffered damages in the amount of $28,673,236.81.

129.    Defendant's persons with authority reasonably appeared to and in fact had authority to ratify the contract or contracts with Solaria and did so, and Solaria reasonably relied on their authority in so doing, incurring substantial costs and changing position such as foregoing alternate sources of debt financing and undertaking the substantial marking and financial obligations entailed with the India Project.

130.    In reasonable reliance upon these representations, Solaria undertook to perform under the contract or contracts in various ways described above.

131.    By reason of the foregoing, Defendant is liable to Plaintiffs for damages of $28,673,236.81.

## Count V: Implied-in-fact equitable estoppel

132.    Plaintiffs repeat and reallege all of the allegations contained in all previous paragraphs as if set forth at length herein.

133.    The Federal Circuit has held specifically that equitable estoppel can be asserted as an independent cause of action against the government, but in cases where an underlying

--23--

written contract already exists. *Burnside-Ott Aviation Training Ctr., Inc. v. United States*, 985 F.2d 1574, 1581 (Fed. Cir. 1993).

134.   The facts of the above count give rise as well to implied-in-fact equitable estoppel where Solaria relied upon them with knowledge of OPIC.

135.   By reason of the foregoing, Defendant is liable to Plaintiffs for damages of $28,673,236.81.

**Count VI: Breach of duty of good faith & fair dealing**

136.   Plaintiffs repeat and reallege all of the allegations contained in all previous paragraphs as if set forth at length herein.

137.   Before entering into the September 2011 agreements, OPIC falsely told Solaria that OPIC was a quasi-governmental agency so that any agreements would not be governed by the Federal Acquisition Regulation (FAR) and government contract law, but rather by New York State contract law.

138.   Such representations implicitly state that Solaria would not be limited in its remedies to those contained in the FAR.

139.   After entering into the September 2011 agreements and the later agreements, OPIC continued to make such false representations and did nothing to dispel the false belief that it had created before September.

140.   OPIC continued to create such a false image by including in the Commitment Letter statements that Solaria would be able to sue in New York or District of Columbia courts of general jurisdiction.

141.   These statements were completely false since OPIC has no such right to waive sovereign immunity where the United States Congress has not done so.

142.   OPIC's conduct breached a covenant of good faith and fair dealing owed to Solaria regarding the agreements described above.

143.   The breach occurred as alleged in the previous counts, that is, (1) by declaring that one of the Commitment Letter's five circumstances, labeled (a) through (e) (found on page 3), had arisen so that OPIC could withdraw; (2) by sending the 9 November letter containing misrepresentations about the contract; (3) by beginning on or about June 2012, telling Solaria that unacceptable provisions would have to be included in the loan rather than telling Solaria forthrightly that OPIC had decided not to provide the financing; (4) by during the entire time of the contracts (September 2011 through December 2012) leading Solaria to believe that the contract would be governed by state law where Solaria would have traditional contract remedies for OPIC' wrongdoing rather than the limited remedies contained in the Federal Acquisition Regulation (FAR); (5) December 2011 instructions by OPIC to proceed with the India Project since the money would be forthcoming; (6) 4 April 2012 promises of Polan to Solaria management; (7) June 2012 promises and representations of Polan to Solaria Director Pfund; (8) including terms in the Commitment Letter Annex that required the immediate expenditure of large

sums by Solaria where Solaria could no longer obtain alternative financing; (9) statements by OPIC that the two committees had approved so that the deal was consummated; (10) inclusion in the Commitment Letter of conditions precedent, all of which occurred save the ministerial acts; (11) OPIC's custom of only issuing commitment letters after it had competed due diligence and made the decision to make the loan; (12) statements by Lynn Tabernacki and staff that if the Commitment Letter were issued, then the agreement was final; (13) the inclusion of a look-back provision to cover immediate expenditures by Solaria on the India Project where Solaria could no longer obtain alternative financing; (14) OPIC's knowledge that Solaria was foregoing the arrangement of an alternative loan based on the promises of OPIC and could no longer obtain alterative financing since such financing could not be obtained in time to complete the India Project and since such financing was no longer feasible where Solaria had depleted its equity financing on the India Project.

144.    This is a complete breach of the covenant of fair dealing and good faith and represents a breach of the entire contract.

145.    The breach of this contract combined with the total lack of remediation attempt and intimidation by OPIC places OPIC in material breach of the agreement and as such Solaria is entitled to full compensatory damages for the value of the contract.

146.    By reason of the foregoing, Defendant is liable to

--26--

Plaintiffs for damages of $28,673,236.81.

**Count VII: Declaratory relief**

147.    Plaintiffs repeat and reallege all of the allegations contained in all previous paragraphs as if set forth at length herein.

148.    A dispute has arisen between Defendant and Solaria as to whether OPIC can withdraw from the Commitment Letter and as to the existence and terms of implied-in-fact modifications to the Commitment Letter.

149.    OPIC contends that one or more of the five conditions for it to cancel the Commitment Letter have arisen and that it properly cancelled it; that no implied-in-fact contracts exist.

150.    Solaria contends that none of the five justifications to cancel the Commitment Letter have arisen, that implied-in-fact contracts were entered into to loan Solaria the $30 million and that OPIC breached these agreements

151.    An actual existing and bona fide controversy exists between the OPIC and Solaria as to their jural and legal relations in respect to the legal fee agreement and the rights of the parties under this agreement that can be determined only by a declaratory judgment.

152.    By reason of the foregoing, Plaintiffs are entitled to a declaration that the agreements are enforceable and that Defendant is liable to Plaintiffs for damages of $28,673,236.81.

**Count VIII: Bad faith denial**

153.    Plaintiffs repeat and reallege all of the allegations

--27--

contained in all previous paragraphs as if set forth at length herein.

154.    As detailed above in Count II, when initially communicating to Solaria that OPIC would not pay Solaria's costs, OPIC through De Amicis made a series of lies in the 9 November letter (**Ex B**) in claiming that some of the five circumstances allowing the Commitment Letter to be cancelled had arisen.

155.    These statements constitute a bad faith denial of Solaria's claim.

156.    By reason of the foregoing, Defendant is liable to Plaintiffs for damages of $28,673,236.81.

**WHEREFORE**, Plaintiffs request a judgment against Defendant for $28,673,236.81 in compensatory damages, interest, and costs of this action, attorney's fees, and such other relief as the Court deems appropriate, as follows:

A.  Under Count I, $28,673,236.81 in compensatory damages, interest at the judicial rate, and costs of this action;

B.  Under Count II, $28,673,236.81 in compensatory damages, interest at the judicial rate, and costs of this action;

C.  Under Count III, $28,673,236.81 in compensatory damages, interest at the judicial rate, and costs of this action;

D.  Under Count IV, $28,673,236.81 in compensatory damages, interest at the judicial rate, and costs of this action;

E.  Under Count V, $28,673,236.81 in compensatory damages, interest at the judicial rate, and costs of this action;

--28--

F. Under Count VI, $28,673,236.81 in compensatory damages, interest at the judicial rate, and costs of this action;

G. Under Count VII, a judgment of declaratory relief that the Commitment Letter and implied-in-fact contracts are actionable and $28,673,236.81 in compensatory damages, interest at the judicial rate, and costs of this action;

H. Under Count VIII, $28,673,236.81 in compensatory damages, interest at the judicial rate, and costs of this action;

I. Such other relief as the Court deems appropriate.

Respectfully submitted,

Dated: *3 December 2013*  Signed:

Michael J. Trevelline, DC Bar #437454
1823 Jefferson Place, NW
Washington, DC 20036-2504
(202) 737-1139/Fax: (202) 775-1118
mjt@mjtlegal.com
**Attorney for Plaintiffs Solaria
Corporation & Solaria India Private
Limited**

3 Exhibits:
A. Commitment Letter
B. 9 November 2012 OPIC Letter
C. Termination Proposal