# Exhibit A.

 Overseas
Private
Investment
Corporation

1100 New York Avenue, N.W.
Washington, D.C. 20527-0001
(202) 336-8400
FAX (202) 408-9859

September 29, 2011

Solaria India Private Limited
202 SSH Pride
Plot 273, Road 78
Jubilee Hills
Hyderabad, AP 500096, India
Attention: Subbarao Tipirneni, Managing Director

Solaria Corporation
6200 Paseo Padre Corporation
Fremont, CA 94555
Attention: Dan Shugar, Chief Executive Officer

Re:       Overseas Private Investment Corporation (**"OPIC"**) Commitment to Provide a
          Credit Facility to Solaria India Private Limited (the **"Borrower"**)

Ladies and Gentlemen:

          This letter (this **"Letter"**) and the Summary of Terms and Conditions (the **"Term Sheet"**), attached hereto as Annex A (this Letter, together with the Term Sheet, the **"Commitment Letter"**), constitute and set forth the terms and conditions of OPIC's commitment to provide to the Borrower, pursuant to Section 234(c) of the Foreign Assistance Act of 1961, as amended, a loan facility in the aggregate principal amount of up to US$30,000,000 (the **"Credit Facility"**). OPIC is willing to provide the Credit Facility on the terms and conditions set forth in this Commitment Letter. By signing this Commitment Letter, (i) the Borrower confirms that it is willing to borrow a loan or loans (the **"Loan"**) under the Credit Facility on the terms and conditions set forth herein, and (ii) Solaria Corporation (which directly owns 100% of the Borrower (the **"Sponsor"**)) acknowledges and agrees to their obligations hereunder.

          The Borrower represents and warrants to OPIC, and the Sponsor represents and warrants to OPIC as to the Borrower and as to itself, that:

          (a) the execution and delivery of this Commitment Letter has been duly authorized by the Sponsor and the Borrower, and this Commitment Letter constitutes a valid, legal, and binding obligation of such party;

          (b) all of the information, data, representations, or other materials that have been or will be made available to OPIC by the Borrower, the Sponsor, or their respective representatives is, or will be at the time such information is made available, complete and correct in all material respects and does not, or will not at the time such information is made available, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements are made;

(c) the consignment of all assets owned by the Borrower or the Sponsor to Solar Semiconductor Inc or Solar Semiconductor Private Limited will be transferred to Jabil Circuit Inc ("Jabil") upon Jabil realizing 10 megawatts of annualized panel production on Borrower or Sponsor owned equipment;

(d) the Sponsor and the Borrower, and their respective officers, directors, employees, and agents, (i) have complied with the Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95-213, §§101-104), as amended, and all other applicable laws, regulations, orders, decrees, or directives having the force of law and relating to bribery, kick-backs, or similar business practices (collectively, the "**Corrupt Practices Laws**") in obtaining any consents, licenses, approvals, authorizations, rights, or privileges in respect of the Project (as defined in the Term Sheet); (ii) have the internal management and accounting practices and controls adequate to ensure compliance with Corrupt Practices Laws; and (iii) the Borrower is otherwise conducting its business in compliance with all Corrupt Practices Laws;

(e) neither the Sponsor nor any of its affiliates has reduced and does not expect to reduce the number of its U.S. employees or the level of operations in the U.S. either: (i) in order to devote resources to the Project or (ii) because the Project's production enables the Sponsor or such affiliate to do so; and

(f) so long as any obligations are outstanding under the Loan Agreement, the Borrower shall not export any products to the U.S. without the prior written consent of OPIC.

The Borrower covenants and agrees for so long as this Commitment Letter is in effect, to comply with all Corrupt Practices Laws and to maintain internal management and accounting practices and controls adequate to ensure compliance with Corrupt Practices Laws.

The Sponsor and the Borrower shall, jointly and severally, pay when due any portion of all fees set forth in the Term Sheet that become due and payable on or prior to the date of execution of a definitive loan agreement between OPIC and the Borrower setting forth the terms and conditions of the Credit Facility (the "**Loan Agreement**").

The Sponsor and the Borrower shall, jointly and severally, pay or, at OPIC's discretion, reimburse OPIC or such persons as OPIC may direct on demand by OPIC for all expenses (including fees and expenses for outside legal counsel and consultants) incurred by OPIC in connection with the issuance of this Commitment Letter and the negotiation and preparation of the Loan Agreement and the documents, instruments, and approvals required to be delivered thereunder, and for all other reasonable out of pocket expenses incurred by OPIC, as well as any costs of collecting any amount due under this Commitment Letter.

The Borrower shall at all times indemnify and hold harmless (the "**Indemnity**"), OPIC and its directors, officers and employees (each, an "**Indemnified Person**") from and against and reimburse such Indemnified Persons for (i) any and all losses, claims, damages, liabilities, penalties, costs and expenses of any kind or nature whatsoever in any way relating to or arising out of or in connection with this Commitment Letter to which an Indemnified Person may become subject (each, a "**Loss**"); and (ii) any and all claims, litigation, investigations, or proceedings relating to any Loss regardless of whether any Indemnified Person is a party thereto, and any and all costs and expenses incurred by an Indemnified Person in defending, analyzing, settling, or resolving a Loss (the "**Costs of Defense**"). The Sponsor shall indemnify and hold harmless (collectively, the "**Sponsor Indemnity**"), at all times, each Indemnified Person for any Loss and any costs of Defense that arise from or in relation to (a) any impact on the environment

caused by or otherwise related to the Project if any final judgment or arbitral award is entered against, or any settlement is entered into by the Sponsor in connection with such Loss, and in connection with such Loss any final judgment, or arbitral award is entered against, or settlement is entered into by, an Indemnified Person, whether in the same or different proceedings or settlement agreements, (b) fraud by the Borrower, the Sponsor, or an affiliate of either of them, or (c) any dispute between or among the Sponsor, the shareholders, members, or partners of the Sponsor or the Borrower. The Indemnity or the Sponsor Indemnity, as applicable, shall not apply to the extent that a court or arbitral tribunal of competent jurisdiction renders a final determination that a Loss or Costs of Defense resulted from (i) the gross negligence or willful misconduct of an Indemnified Person, or (ii) OPIC's failure to perform any act required of it under this Commitment Letter. The foregoing indemnities are independent of and in addition to any other rights of any Indemnified Person in connection with any Loss or Costs of Defense hereunder, under any other agreement, or at law. OPIC and each other Indemnified Person shall have the right to control its, his, or her defense; *provided, however,* that each Indemnified Person shall (i) notify the Borrower in writing as soon as practicable of any Loss or Costs of Defense, and (ii) keep the Borrower reasonably informed of material developments with respect thereto.

If for any reason the Loan Agreement is not executed and delivered on or before March 30, 2012, OPIC's obligations hereunder shall terminate. In addition, by written notice to the Borrower and the Sponsor, OPIC may, at any time, terminate its obligations hereunder and pursue any rights and remedies then available to OPIC upon the occurrence of any of the following: (a) the Sponsor or the Borrower fails or refuses to comply in a timely manner with any of the terms, provisions, or conditions of this Commitment Letter; (b) OPIC, in its sole judgment, determines that a material adverse change has occurred or is reasonably likely to occur in (i) business, operations, property, condition (financial or otherwise) or prospects of the Borrower, the Sponsor, or the Project, (ii) the ability of the Borrower or the Sponsor to carry out the Project or to perform its respective obligations hereunder or under the Loan Agreement or under any other document executed in connection therewith, or (iii) the condition or value of any security; (c) any of the information, data, representations, or other materials submitted to OPIC by the Sponsor or the Borrower contains any inaccuracy, omission, or misrepresentation that is material to OPIC's decision to provide the Credit Facility on the terms set forth herein; (d) it becomes unlawful for OPIC to make or maintain any commitment to extend credit or allocate funds for the Project due to the adoption of, change in, change in the interpretation of, or change in the effectiveness of, any applicable law after the date of this Commitment Letter; or (e) OPIC, in its sole judgment, is not satisfied with the results of its due diligence investigation. Upon any such termination (except pursuant to clause (d)), the Borrower or the Sponsor shall pay to OPIC on demand any fees, expenses, or other amounts then due hereunder.

The representations and warranties, and the payment, reimbursement, and indemnification provisions contained herein shall survive the execution of the Loan Agreement and any modification, cancellation, termination, or expiration of this Commitment Letter or the Credit Facility.

All payments due hereunder to OPIC shall be paid in U.S. dollars by wire transfer as follows:

> U.S. Treasury Department
> New York, NY
> ABA No. 0210-3000-4
> TREAS NYC/CTR/BNF=AC-71000001
> OBI=OPIC Loan Number 386-2011-064-DI.

Page 3

All payments shall be made without withholding or deduction of any tax, assessment, or other governmental charge (collectively, "**Tax**") unless required by law. If the Borrower or the Sponsor is required to deduct or withhold any Tax, it shall be obligated to pay to OPIC such additional amounts as are required to result in OPIC's receipt of a net amount, from the Borrower or the Sponsor after such deduction, withholding, or payment of the Tax, that is equal to the amount otherwise due to OPIC hereunder.

The illegality or unenforceability of any provision of this Commitment Letter shall not in any way affect or impair the legality or enforceability of the remaining provisions hereof. If, and to the extent that, the obligations of any party hereunder are unenforceable for any reason, such party shall make the maximum contribution to the payment and satisfaction thereof as is permissible under applicable law.

Neither the Borrower nor the Sponsor may assign this Commitment Letter or any rights hereunder to any person or entity. This Commitment Letter is for the sole benefit of the Borrower, the Sponsor, and OPIC, and no other person (other than the Indemnified Persons) shall be a direct or indirect beneficiary of, be entitled to rely on, or have any direct or indirect cause of action or claim in connection with, this Commitment Letter.

THIS COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Any legal action or proceeding with respect to this Commitment Letter or any document related hereto may be brought by OPIC in the courts of the District of Columbia, the State of New York, or the United States of America for the Southern District of New York, and, by execution and delivery of this Commitment Letter, each of the Sponsor and the Borrower accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Each of the Sponsor and the Borrower hereby accepts venue in each such court.

EACH OF OPIC, THE SPONSOR AND THE BORROWER WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE ARISING OUT OF, IN CONNECTION WITH, OR RELATED TO, THIS COMMITMENT LETTER OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

This Commitment Letter may be executed in separate counterparts, each of which shall be an original, and all of which taken together shall constitute one and the same agreement.

If this Commitment Letter correctly sets forth our agreement, please indicate your acceptance of the terms hereof by signing and returning to OPIC an executed original counterpart of this Commitment Letter no later than September 30, 2011. Upon timely receipt of such signed counterpart (by facsimile with the original to follow by overnight courier) by OPIC, this Commitment Letter shall constitute an effective and legally binding agreement among us as of the date hereof.

Very truly yours,

OVERSEAS PRIVATE INVESTMENT CORPORATION

By: _____

Name: _Lynn T. Tabernada_

Title: _Managing Director_

ACKNOWLEDGED AND AGREED TO
as of the date of this Commitment Letter:

SOLARIA INDIA PRIVATE LIMITED

By: _____

Name: _SUBBARAO V TIPIANENI_

Title: _MANAGING DIRECTOR_

SOLARIA CORPORATION

By: _____

Name: _DANIEL S. SHUGAR_

Title: _CEO_

**ANNEX A**

**SUMMARY OF TERMS AND CONDITIONS**

## Solaria India Private Limited
## Indicative Terms and Conditions
## for the Proposed Direct Loan Transaction

| | |
|---|---|
| 1. Project ID: | OPIC/386-2011-064-DI |
| 2. Lender: | Overseas Private Investment Corporation (**"OPIC"**). |
| 3. Borrower: | Solaria India Private Limited, a private limited company established under the laws of the Republic of India (the **"Borrower"**). |
| 4. Purpose: | The proceeds of the Loan (defined below) will be used for the development, implementation and operation of a 120MW solar module manufacturing facility located in India (the **"Project"**). |
| 5. U.S. Shareholder: | Solaria Corporation, a Delaware corporation (the **"Shareholder"**), which owns 100% of the shares/ownership interests in the Borrower. |
| 6. Proposed Commitment: | A loan facility in a principal amount not to exceed $30 million (the **"Commitment"**). |
| 7. Total Project Costs: | $46 million, of which $16 million shall be contributed in cash as equity or subordinated debt. |
| 8. Disbursements and Availability: | During the Commitment Period (defined below), the Borrower will be eligible to draw a loan or loans under the Commitment (the **"Loan"**) in accordance with the following terms and conditions:  There shall be no more than one (1) disbursement (a **"Disbursement"**) in each fiscal quarter and no more than five (5) total Disbursements.    Each Disbursement shall be in multiples of $100,000, but not greater than $15 million.  Each Disbursement shall be evidenced by a promissory note (a **"Note"**) issued by the Borrower in connection with the Disbursement, in the principal amount of the Disbursement, and maturing on the Loan Maturity Date (defined below). |
| | The **"Commitment Period"** means the period commencing on the date of execution of the Loan Agreement (defined below), and ending on the earliest of (a) the first date on which the amount of the Loan equals the amount of the Commitment, (b) the second anniversary of the first Disbursement of the Loan, provided, however, that if the first Disbursement has not occurred on or before the first anniversary of the date of execution of the Loan Agreement, the Commitment Period shall end on such date, and (c) the date the Commitment has otherwise been |

terminated.

| | |
|---|---|
| 9. Loan Term and Repayment: | The Loan shall be repaid in thirty (30) approximately equal quarterly installments, commencing on the earlier of (a) the first Payment Date (defined below) following twenty-four (24) months after the date of the first Disbursement, and (b) June 15, 2014 (the period from the first Disbursement until such date, the **"Grace Period"**); and ending no later than June 15, 2021, the **"Loan Maturity Date"**. |

Any Loan amounts repaid or prepaid cannot be reborrowed.

| | |
|---|---|
| 10. Interest: | Interest shall be paid quarterly on March 15, June 15, September 15, and December 15 of each year (each such date, a **"Payment Date"**) in arrears, beginning on the Payment Date immediately following the first Disbursement, accrued on the outstanding principal balance of each Note, calculated at a fixed rate *per annum* for each Disbursement equal to the OPIC cost of funds (determined by the U.S. Treasury rate corresponding to the term of the Loan, and as further defined in the Loan Agreement), plus two and three quarters percent (2.75%) *per annum* (such sum, the **"Interest Rate"**). Interest, fees and expenses payable with respect to the Loan are included in Project costs that may be funded with the proceeds of the Loan. |

| | |
|---|---|
| 11. Default Interest: | If the Borrower fails to pay when due any amount due to OPIC under any Financing Document (defined below), the Borrower shall pay to OPIC post-default interest at the rate of (a) with respect to amounts due under a Note, two percent (2.0%) *per annum* over and above the Interest Rate specified in the Note, and (b) with respect to any other amounts due, two percent (2.0%) *per annum* above the highest Interest Rate set forth in any Note then outstanding. |

| | |
|---|---|
| 12. Voluntary Prepayment: | The Loan may be voluntarily prepaid, in whole or in part, at any time without fee or penalty. |

The minimum partial prepayment shall be $100,000. Partial prepayments shall be applied to installments in the inverse order of maturity.

| | |
|---|---|
| 13. Mandatory Prepayment: | The Borrower shall prepay the Loan in the event that and in the amount by which: (a) the aggregate amount of property and casualty insurance proceeds received by the Borrower during any fiscal year is not applied to the repair or replacement of assets insured thereby within one hundred eighty (180) days after receipt by the Borrower, or (b) in any fiscal year following the third anniversary of the date of the first principal Payment Date, the aggregate amount of dividend and/or restricted payments to the Shareholders exceeds the higher of (i) seventy-five percent (75%) of |

cumulative cash flow of the Borrower for the preceding twelve months and (ii) fifty percent (50%) of cumulative cash flow of the Borrower for the preceding three (3) years.

14. Commitment Fee:

A commitment fee equal to fifty basis points (.50%) *per annum* on the undisbursed and uncanceled amount of the Commitment, accruing on a daily basis for each day of the Commitment Period, is to be paid to OPIC in arrears on each Payment Date and on the last day of the Commitment Period.

15. Cancellation Fee:

The Borrower may cancel any part of the undisbursed Loan at any time upon payment, for any cancellation occurring after the execution of the Loan Agreement, of a cancellation fee equal to one and one-half percent (1.5%) of the amount cancelled (the "**Cancellation Fee**"). Any part of the Commitment not disbursed at the end of the Commitment Period or terminated for any reason following the execution of the Loan Agreement shall be deemed to have been cancelled and the Cancellation Fee shall apply; provided, however, that the Cancellation Fee shall not apply to any amount of the Project contingency of [$2,900,000] to be funded with the Loan that is not disbursed prior to the end of the Commitment Period.

16. Facility Fee:

A facility fee, equal to $225,000, is to be paid to OPIC on or prior to the date of the initial Disbursement.

17. Maintenance Fee:

On the first anniversary of the Payment Date immediately following the date of the initial Disbursement, and on each subsequent anniversary thereof for so long as any portion of the Loan remains outstanding, the Borrower shall pay to OPIC a maintenance fee in the amount of $15,000.

18. Modification Fee:

In the event that the Borrower requests an amendment or waiver to the Loan Agreement or any other Financing Document (each defined below), OPIC will consider such an amendment or waiver on its merits upon payment by the Borrower, at the time of such request, of a fee, determined by OPIC, based on the complexity and timing constraints of such amendment or waiver (the "**Modification Fee**"); provided, however, that no Modification Fee will be payable if the amendment or waiver is necessary: (a) to correct an error or omission in any Financing Document, or (b) in OPIC's determination, to improve the operations of the Project without materially altering the risks undertaken by OPIC. OPIC is under no obligation to agree to any amendment or waiver.

OPIC may request a Modification Fee in connection with restructurings of any kind or any prepayment requiring releases of collateral or other similar actions by OPIC.

19. Taxes:

All sums payable by the Borrower under the Loan Agreement or other Financing Documents shall be paid in full, free of any deductions or withholdings of any and all taxes.

20. Payments of or Reimbursement of Expenses:

OPIC may retain consultants as necessary, including U.S. and local legal counsel, at any time until the Loan is indefeasibly repaid in full. The Borrower will pay or reimburse OPIC for all of OPIC's out-of-pocket fees and expenses, including the fees and expenses of OPIC's business consultants and legal counsel, incurred in connection with the negotiation, preparation, execution, delivery, notarization, recordation, and implementation of the Financing Documents and the other documents, instruments, and approvals required to be delivered thereunder. The Borrower shall also reimburse OPIC, upon demand, for all costs and expenses (including attorneys' fees and expenses and the cost of travel) incurred by OPIC (a) in preserving in full force and effect, or enforcing its rights under, any of the Financing Documents, and (b) in addition to the Modification Fee, in connection with any amendment or waiver related to any of the Financing Documents. The agreement between Borrower and outside counsel to OPIC governing the payment of legal fees shall obligate such outside counsel to (i) provide an estimate prior to commencement of work of legal fees to be incurred through the first Disbursement, (ii) issue monthly invoices for fees and expenses incurred and (iii) if there are any actual or projected significant deviations from the budget estimates, advise the OPIC in-house attorney as soon as it becomes aware of such deviation, who shall in turn advise the Borrower.

21. Collateral Security and Key Project Documents:

The Borrower's obligations to OPIC shall be secured by collateral satisfactory to OPIC pursuant to documentation satisfactory to OPIC, including at a minimum the following (the "**Security Documents**"):

- a.) A valid, first priority, perfected security interest in all of the Borrower's assets, whether now or hereinafter acquired, tangible and intangible, including all customer deposit accounts, accounts receivable, inventory, real property, and rights under the Project agreements;
- b.) A pledge of all of the Shareholder's shares/ownership interests in the Borrower;
- c.) A debt service reserve account held in India and in rupees representing principal and interest equal to [6] six months of the highest level of debt service    (the "**Debt Service Reserve Account**"), which shall not be funded from the Loan proceeds but from equity, all in accordance with the requirements of the Reserve Bank of India;
- d.) An assignment of all Project Documents (as defined below) and a direct agreement between OPIC and each contract counterparty with respect to the Contract Manufacturing Agreement (defined

below) and the Master Services Agreement (defined below);

e.) An assignment of the license to use all technology rights and licenses of the Shareholder that relate to the operations of the Borrower[1];

f.) A project completion agreement between the Shareholder and OPIC pursuant to which the Shareholder agrees to cause the Borrower to perform all of its obligations required to achieve Project Completion and to guarantee all financial obligations of the Borrower, including under the Loan Agreement (up to a total amount to be agreed) until Project Completion (which shall be defined to include certain physical, legal and financial completion tests to be agreed);[2] and

g.) An assignment of insurance proceeds.

Additional Project agreements, satisfactory to OPIC, shall be required to implement the Project, including, *inter alia,* the following (the "**Project Documents**"):

a.) Contract manufacturing agreement(s) with a contract manufacturer(s) acceptable to OPIC (the "**Contract Manufacturing Agreement**"), provided, that (subject to completion of due diligence as provided in paragraph 23(a) below) Jabil Circuit, Inc. ("Jabil") shall be deemed to be acceptable to OPIC for 120MW of capacity and (subject to completion of due diligence as provided in paragraph 23(a) below)   Solar Semiconductor Inc. shall be deemed an acceptable manufacturer of up to 20 MW of the Project's production until such date as Borrower, exercising commercially reasonable efforts, transfers all such production to Jabil, provided that such transfer, including the transfer of all assets owned by the Borrower or the Sponsor that are utilized by Solar Semiconductor Inc. or Solar Semiconductor Private Limited to Jabil's facilities, will take place upon Jabil achieving 10 megawatts of annualized panel production on Borrower or Sponsor owned equipment.

b.) A master services and technology licensing agreement between the Shareholder and the Borrower for implementation of the Project including an agreement (subject to Section 25(o) below) that all Shareholder and Borrower purchase orders received from customers for deliveries outside of the United States or Canada will be fulfilled by the Borrower (the "**Master Services Agreement**");

c.) Any major input supply agreements over $100,000; and

d.) Any lease agreements or sub-lease agreements of the Borrower greater than $100,000 per annum.

---

[1] Local counsel to review with regard to local law.
[2] To be determined with the assistance of the independent engineer.

22. Documentation:  The terms and conditions of the Loan shall be set forth in a definitive loan agreement between OPIC and the Borrower (the **"Loan Agreement"**), which along with the Security Documents, the Project Documents, and other agreements, documents, instruments, and approvals will collectively be referred to as the **"Financing Documents"**).  These documents will require, among other key provisions:

a.) submission to jurisdiction of New York courts and appointment of an agent for service of process;

b.) designation of New York law as the governing law of the Loan Agreement and the project completion agreement and either local law or New York law, as OPIC shall determine, for the Security Documents and Project Documents; and

c.) indemnity by the Borrower of OPIC and its directors, officers, and employees (the "**Indemnified Persons**") from and against, and reimbursement to such Indemnified Persons for, (i) any and all losses, claims, damages, liabilities, penalties, or other costs relating to the Loan, the Loan Agreement, any other Financing Document, the Project, the Commitment, or the use or intended use of the proceeds thereof to which an Indemnified Person may become subject ("**Losses**"); and (ii) any and all claims, litigation, investigations, or proceedings relating to any Loss regardless of whether any Indemnified Person is a party thereto, and any and all costs and expenses incurred by an Indemnified Person in defending, analyzing, settling, or resolving a Loss ("**Costs of Defense**"), *provided, however*, that the indemnity shall not apply to the extent that a court or arbitral tribunal of competent jurisdiction renders a final determination that a Loss or Costs of Defense resulted from (a) the gross negligence or willful misconduct of an Indemnified Person, or (b) OPIC's failure to perform any act required of it relating to the Loan.

23. Conditions Precedent to Initial Disbursement:  Conditions customary to a transaction similar in nature, including, *inter alia*:

a.)  OPIC shall have completed due diligence of the Borrower, the Shareholder, the counterparty to each Project Document (including each contract manufacturer) and the Project and matters relating thereto, and the results of such investigation shall be satisfactory to OPIC;

b.)  Any equipment or other assets used by the Borrower but owned by the Shareholder (the "**Borrower Assets**") shall be transferred to the Borrower (and there shall be an ongoing covenant to transfer future assets);

c.)  The Borrower shall have obtained licenses to use all current and future intellectual property owned by the Shareholder that relates to the operations of the Borrower;

d.)  The Borrower shall have established appropriate accounting

systems to produce Borrower accounting statements;

e.) All liens on all Borrower Assets in favor of other lenders shall be removed;

f.) OPIC shall be satisfied with the Borrower's contract manufacturing agreements with Solar Semiconductor Inc., Jabil and any other contract manufacturer;

g.) Execution and delivery of definitive Financing Documents in form and substance satisfactory to OPIC;

h.) All necessary governmental and third party permits, licenses and consents for the Project shall have been obtained and shall be in full force and effect;

i.) Equity contributions from the Shareholder shall have been made on a *pro rata* basis with respect to the Loan in accordance with the financial plan agreed between the Borrower and OPIC, and such contributions shall have been verified to the satisfaction of OPIC;

j.) OPIC shall have received financial projections for the Project through December 31, 2024 to its satisfaction, including projected financial statements prepared in English on the basis of GAAP;

k.) OPIC shall have received satisfactory legal opinions from the Borrower's local counsel, its own local counsel, and the Borrower's and Shareholder's U.S. counsel;

l.) The Borrower shall have obtained a D-U-N-S® number issued by Dun & Bradstreet, Inc. and provided such number to OPIC in writing, and the Borrower shall have provided to OPIC (a) its U.S. Taxpayer Identification Number or (b) an explanation as to why it does not have or need a U.S. Taxpayer Identification Number;

m.) The Borrower and each Project Document counterparty shall have appointed an agent for service of process until the Loan Maturity Date plus six (6) months and paid the fees of such agent in full;

n.) All Security Documents shall have been properly filed and registered or recorded in any jurisdiction where filing and registration or recordation is required, as applicable, and all liens or pledges in favor of OPIC shall have been properly registered in favor of OPIC;

o.) A report from an independent engineer satisfactory to OPIC shall have been received and determined acceptable to OPIC;

p.) A report from an independent market consultant satisfactory to OPIC shall have been received and determined acceptable to OPIC;

q.) The Debt Service Reserve Account shall have been established and fully funded with equity contributions in accordance with the requirements of the Reserve Bank of India;

r.) OPIC shall have received relevant certifications, agreements and other documents customary for transactions of this type, including English translations of any document delivered by the Borrower, as it may reasonably request.

**24. Conditions Precedent to Each Disbursement:**

Conditions customary to a transaction similar in nature, including, *inter alia*:

a.) All representations and warranties of the Borrower under the Loan Agreement and the Sponsor under the project completion agreement shall be true and correct, including a representation and warranty by the Sponsor that neither the Sponsor nor any of its affiliates has reduced and does not expect to reduce the number of its U.S. employees or the level of operations in the U.S. either: (i) in order to devote resources to the Project or (ii) because the Project's production enables the Sponsor or such affiliate to do so;

b.) There shall be no default or event of default in existence at the time of or after giving effect to the Disbursement;

c.) Nothing shall have occurred and be continuing that, in OPIC's reasonable judgment, could have a material adverse effect on (i) the Project; (ii) the business, operations, property, condition (financial or otherwise), or prospects of the Borrower, the Shareholder, the Project, or any other person whose continuing viability, because of its guaranty or other undertaking, is essential to the Project; (iii) the ability of the Borrower or any other party to carry out the Project or to perform its respective obligations under the Financing Documents; (iv) the validity or enforceability of any material provision of any Financing Document; (v) the rights and remedies of OPIC under any of the Financing Documents; or (vi) the liens provided to OPIC under the Security Documents;

d.) Achievement of certain performance based milestones to be determined including metrics such as cost of goods sold per watt, capacity utilization rates and output per hour, sales pipeline and others;

e.) All fees and expenses payable by the Borrower shall have been paid in full;

f.) Equity contributions from the Shareholder shall have been made on a *pro rata* basis with respect to the Loan and in accordance with the financial plan agreed between the Borrower and OPIC, and such equity contributions shall have been verified to the satisfaction of OPIC;

g.) The Debt Service Reserve Account shall have been funded up to the required amount; and

h.) OPIC shall have received such other certificates, opinions, agreements, and documents, including English translations of any document delivered by the Borrower, as it may reasonably request.

25. Primary
Financial Reporting
Requirements and
Other Covenants:

The Borrower shall comply with covenants customary to a transaction similar in nature, including, *inter alia*:

a.) Within 45 days after the end of each fiscal quarter, provide financial statements prepared in English in accordance with GAAP;

b.) Within 120 days after the end of each fiscal year, provide audited financial statements prepared in English in accordance with GAAP;

c.) Within 45 days after the end of each fiscal quarter during the initial construction and implementation of the Project, provide a progress report prepared in English;

d.) Within 45 days after the end of each fiscal quarter, a report detailing the Borrower's sales pipeline and purchase order backlog;

e.) Within 45 days after the end of each fiscal quarter, provide a calculation for each month during the preceding fiscal quarter of the average watts produced per day in the preceding 30 days and the average cost of goods sold per watt in the preceding 30 days as compared to the international average according to Bloomberg New Energy Finance or another industry source acceptable to OPIC;

f.) Within 45 days after the end of each fiscal quarter, provide a schedule summarizing all new sales agreements entered into by the Borrower and the Shareholder;

g.) Within 45 days after the end of each fiscal quarter, provide a report detailing availability of key materials and supply plans for the next twelve months including ability to meet key material requirements through supply contracts already in effect;

h.) Within 45 days after the end of each fiscal quarter, provide a report summarizing all related party transactions during the preceding fiscal quarter prepared in English; and

i.) Within 30 days prior to the beginning of the fiscal year, provide an annual operating budget for the Borrower prepared in English;

j.) Not later than June 30 of each year, beginning on June 30, 2012, provide a completed self-monitoring questionnaire;

k.) Ensure that no liens are incurred on the Borrower's assets and no indebtedness is undertaken;

l.) Ensure no payments to the Shareholder or any affiliate thereof, excluding payments under the Master Services Agreement in accordance with the financial plan, except if all of the following conditions have been satisfied and subject to the mandatory prepayment provisions: (i) Project Completion (defined in the project completion agreement) has occurred; (ii) no default or event of default shall have occurred and be continuing or will occur as a result of such payment; and (iii) the financial ratios

described below shall have been met after giving effect to such payment;

m.) Ensure no change in control in the beneficial ownership of the Borrower;

n.) Ensure no change in contract manufacturer unless approved by OPIC;

o.) Ensure that the Borrower, its owners, its directors, and its members of senior management are not included in the Specially Designated Nationals and Blocked Persons List maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control;

p.) Cooperate with OPIC in the event that OPIC chooses at its own expense to exercise its right to assign the duties associated with monitoring, management and administration of the Loan ("**Asset Management**") to a third party that shall act as an agent of OPIC (the "**Asset Manager**") in addressing such matters as any Asset Manager may require in connection with such Asset Management;

q.) Ensure that all product orders filled by Shareholder or its affiliates with respect to deliveries outside of the United States and Canada are filled from available production from the Project absent a compelling business reason to do otherwise (for the avoidance of doubt, sourcing from facilities other than the Project pursuant to the requirements of applicable export financing shall constitute a valid business reason); and

r.) Ensure that so long as any obligations are outstanding under the Loan Agreement, the Borrower shall not export any products to the U.S. without the prior written consent of OPIC.

| | |
|---|---|
| 26. Financial Ratio Covenants: | Financial ratio covenants to be maintained by the Borrower to monitor ongoing financial performance, including, *inter alia*: |

a.) Maintain a debt/equity ratio not greater than 3 to 1, as measured quarterly beginning with the quarter end immediately following the Grace Period;

b.) Maintain current assets to current liabilities of not less than 1.4 to 1; and

c.) Immediately following the Grace Period, maintain (i) a ratio of cash flow for the most recently completed four (4) consecutive full fiscal quarters, taken as a single accounting period, to debt service for the most recently completed four (4) consecutive full fiscal quarters, taken as a single accounting period, of not less than 1.5 to 1; and (ii) a ratio of cash flow for the most recently completed four (4) consecutive full fiscal quarters, taken as a single accounting period, to projected debt service for the next succeeding four (4) consecutive full fiscal quarters of not less than 1.5 to 1.

27. Policy
Covenants:

Covenants to monitor the Borrower's compliance with OPIC policy requirements, including, inter alia:

a.) The Borrower shall comply with Corrupt Practices Laws as defined in the Letter and implement internal management and accounting practices and controls adequate to ensure compliance with such Corrupt Practices Laws;

b.) The Borrower shall comply with, and conduct its business, operations, assets, equipment, property, leaseholds, and other facilities in compliance with (i) the International Finance Corporation's Environmental, Health and Safety Guidelines (April 30, 2007), applicable laws and regulations, OPIC's environmental policies, and other terms and conditions as may be set forth in the Loan Agreement, (ii) maintain all required permits and approvals relating to environmental, health, or safety matters, and (ii) the environmental conditions set forth in Schedule 1;

c.) The Borrower shall (i) not take any actions to prevent Workers (defined below) from lawfully exercising their rights of association and their right to organize and bargain collectively; (ii) observe applicable laws relating to a minimum age for employment of children, acceptable conditions of work with respect to minimum wages, hours of work, and occupational health and safety; (iii) not use forced or compulsory labor, including, but not limited to any form of slavery, debt bondage or serfdom; (iv) explain, document, and make available in writing and orally to each Worker, information regarding all of their working conditions and terms of employment, including their entitlement to wages and any benefits, prior to the later of (A) thirty (30) days after the date of the Loan Agreement or (B) each Worker commencing work; (v) not employ persons, formally or informally, under the age of eighteen (18) for work involving hazardous activity, which is work that, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety, or morals of those persons; (vi) comply with the requirements set forth in Schedule 2; and (vii) require each Project Contractor (defined below), with respect to itself and any of its Project Subcontractors (defined below), to comply with the foregoing requirements; provided that if any applicable law, or collective bargaining agreement, imposes a requirement that is more protective of worker rights than any of the foregoing requirements, the Borrower shall, and shall cause the Project Contractor(s) and Project Subcontractor(s) to, observe such applicable law or collective bargaining agreement (the requirements set forth above, collectively, the "**Worker Rights Requirements**");

d.) In the event that information concerning non-compliance or

potential non-compliance with the Worker Rights Requirements (a **"Worker Rights Non-Compliance"**) comes to the attention of a responsible officer of the Borrower, the Borrower shall give prompt notice thereof to OPIC.  The Borrower shall use all reasonable efforts, including remediation, to cure or to cause the relevant Project Contractor or Project Subcontractor to cure, or prevent the recurrence of, any Worker Rights Non-Compliance;

e.)  Notwithstanding the foregoing subclauses (c) and (d), the Borrower shall not be responsible for any Worker Rights Non-Compliance resulting from the actions of a government.

Schedule 1

In addition to the relevant standards and guidelines, the Borrower shall adhere to the following conditions:

1. The Borrower shall implement the Action Plan, attached as Appendix A.

2. Any reports or other documentation required in the Action Plan should be submitted electronically to eia@opic.gov and in hard copy to Director, Environmental Affairs, Overseas Private Investment Corporation, 1100 New York Avenue, N.W, Washington, D.C. 20527

3. The Borrower shall notify OPIC immediately, and in no event later than 48 hours after the Borrower should have become aware through the exercise of reasonable due diligence and care, of any accident that results in the loss of life or that has, or that could reasonably be foreseen to have a material adverse impact on the environment. The Borrower shall submit to OPIC within 30 days after the occurrence of such event a summary report thereof.

Schedule 2

<u>In addition to the standard worker rights language in the Loan Agreement template, the Borrower shall:</u>

a) Operate in a manner consistent with the requirements of the International Finance Corporation's Performance Standard 2 on Labor and Working Conditions;

b) With respect to Workers, not take any actions, or otherwise interfere with, coerce or penalize, on the basis of the right of association or on the basis of organization and collective bargaining activities or membership that may result in any form of retaliation, including, but not limited to, termination, suspension, demotion, blacklisting or transfer of any Worker by the Borrower, or by an officer, agent or representative thereof;

c.) Pay all wages, including all legally-mandated bonus pay and premium pay for overtime work, in full, in legal tender, and in a timely fashion, to Workers except when Workers have agreed otherwise;

d.) Not require hourly and/or quota-based wage Workers to work more than 48 standard hours of work per week and that all Workers shall be guaranteed a weekly 24- hour rest period;

e.) Shall employ no persons under the age of 15 (fifteen) for general work and no persons under the age of 18 (eighteen) for work involving hazardous activity;

f.) Ensure that all Workers have the right to remove themselves from hazardous situations without jeopardizing their continued employment; and

g.) Beginning on December 31, 2012 and every year thereafter, the Borrower shall provide OPIC with an annual report summarizing the Project's working conditions. At a minimum, the report should include the following information:

    a. Compliance with the Worker Rights Requirements in OPIC agreements.

    b. The results of any internal or external audits against the Electronic Industry Citizenship Coalition (EICC) Code of Conduct.

    c. Summary of labor-related compliance issues identified by the local regulatory authorities, complaints received from Workers as well as actions taken in response to such complaints, and actions taken to improve working conditions and to establish, maintain, and improve the Worker-management relationship.

**"Project Contractor"** means a person that is a party to a Project Contract with the Borrower.

"**Project Contracts**" means a contract related to the development or operation of the Project between the Borrower and a Project Contractor or between a Project Contractor and a Project Subcontractor.

"**Project Subcontractor**" means a person, other than the Borrower, that is a party to a Project Contract with a Project Contractor.

"**Workers**" means, collectively, (a) individuals that are employed directly by the Borrower, and (b) individuals that, under a Project Contract, perform continuous on-site work that is either (i) of substantial duration or (ii) material to the primary operations of the Project.

## Appendix A--Action Plan

| No. | Action | Due Date |
|-----|--------|----------|
| 1 | **Social and Environmental Management System** | |
| 1.1 | The Borrower shall provide OPIC with a community grievance mechanism to receive and facilitate resolution of concerns and grievances about the Borrower's environmental and social performance. The Borrower shall report to OPIC on the implementation of its grievance mechanism. It should not be amended in any way other than to make it more protective. | **Prior to first disbursement** |
| 1.2 | The Borrower shall operate the Project in compliance with all applicable environmental and social performance requirements, including requirements related to healthy and safe work environments, host country laws and regulations and other terms and conditions as may be set forth in the credit agreement. In addition, the Borrower shall operate and manage the Project in accordance with its company Environmental and Safety Policy and Illness and Injury Prevention Program. | **Ongoing** |
| 1.3 | The Borrower shall to implement the following components of the 2007 International Finance Corporation(IFC) Environment, Health and Safety General Guidelines: Section 1.0 Environment 1.2 Energy Conservation 1.3 Wastewater and Ambient Water Quality 1.5 Hazardous Materials Management 1.6 Waste Management 1.7 Noise Section 2.0 Occupational Health and Safety 2.1 General Facility Design and Operation (all) 2.2 Communication and Training (all) 2.3 Physical Hazards (all) 2.4 Chemical Hazards (all) 2.7 Personal Protective Equipment (all) 2.9 Monitoring (all) Section 3.0 Community Health and Safety 3.1 Water Quality and Availability 3.2 Structural Safety of Project Infrastructure (all) | **Ongoing** |

| | | |
|---|---|---|
| | 3.3 Life and Fire Safety (all)<br>3.4 Traffic Safety<br>3.7 Emergency Preparedness and Response<br>Section 4.0 Construction and Decommissioning (all) | |
| 1.4 | The Borrower shall deliver to OPIC a copy of the Consent Order issued for the Jabil Pune facility to conduct Solaria's manufacturing operations. | **Prior to Solaria manufacturing operations at Jabil Pune facility.** |
| 1.5 | The Borrower shall deliver to OPIC, beginning on December 31, 2012 and on that date each year thereafter, copies of the reports that SSPL and Jabil submit to the state Pollution Control Boards regarding the conditions stipulated in the Consent and Authorization Order including water and air emission limits, ambient air quality standards, noise limits, effluent discharge limits and hazardous waste disposal methods. | **December 31, 2012** |