# Exhibit B₂



Overseas
Private
Investment
Corporation

1100 New York Avenue, N.W.
Washington, D.C. 20527-0001
(202) 336-8400
FAX (202) 408-9859

November 9, 2012

Mr. Daniel Shugar
Chief Executive Officer
Solaria Corporation
6200 Paseo Padre Parkway
Fremont, CA 94555

Dear Mr. Shugar:

I am writing in response to your October 26, 2012 letter (the "Letter") in which you demand that OPIC reimburse Solaria in an amount that purports to relate to expenses incurred by Solaria in connection with its application for and negotiation of OPIC financing. Given the significant amount of resources OPIC has dedicated to the Solaria project for more than one year, I was surprised by the Letter's litigious tone. After carefully reviewing the allegations in your Letter, I have concluded that they unfairly mischaracterize the underlying facts and are without merit. As such, OPIC declines your demand for reimbursement.

Throughout the entire period in which OPIC has been involved with the potential Solaria transaction, we have worked diligently and in good faith to arrive at a deal structure that was both technically sound and financially viable for both Solaria and OPIC – a fact acknowledged by Solaria on many occasions, including most recently in an email from Solaria's President to OPIC.

As an agency of the United States government, OPIC takes very seriously its legal and contractual obligations, including its responsibility to operate in the best interests of U.S. taxpayers. OPIC may, by law, determine the terms and conditions it will enter into legal obligations. In discharging these responsibilities, OPIC, among many other things, insists in its contractual documentation that customary conditions precedent be met before OPIC will agree to disburse funds in connection with an OPIC-financed structure. With respect to Solaria, the Commitment Letter executed between OPIC and Solaria on September 29, 2011, as extended on March 28, 2012 (the "Commitment Letter"), contains *inter alia* the following condition:

- "OPIC shall have completed due diligence of the Borrower, the Shareholder, the counterparty to each Project Document (including each contract manufacturer) and the Project and matters relating thereto, and the results of such investigation shall be satisfactory to OPIC;"

As you know, the due diligence process for any proposed financing is necessarily fluid and, unless more specifically defined, does not begin and end on dates certain and does not guarantee that any particular outcome will be achieved. Rather, due diligence is an iterative, educational process during which a lender, together with the good faith cooperation of a proposed borrower, learns more about the business, creditworthiness, prospects and business plan of the borrower (and, as appropriate, its affiliates) and attempts to determine the extent to which a proposed transaction structure is technically and financially viable. If the lender is satisfied with its due diligence, then the transaction may proceed; if not, depending on the relevant documents, the lender may propose alternative structures and/or may elect not to proceed at all. While a prospective borrower may incur

significant expenses throughout the process, sophisticated parties are always cognizant that the outcome of due diligence may not be satisfactory. This is the very nature of due diligence between sophisticated counterparties.

The due diligence process undertaken by OPIC with respect to Solaria has been no different. As you know, throughout the Solaria diligence process OPIC became aware of certain facts that called into question the viability of the proposed transaction as initially conceived. While not exhaustive, the list below serves as an illustration of the various issues that have arisen through the diligence process since the time of the Commitment Letter:

- Changes to Solaria's business model in which Solaria desired to expand manufacturing activities into new markets beyond India. This expansion could have potentially eroded the Indian entity's projected cash flows and was inconsistent with the cash flow profile originally approved and embodied in the Commitment Letter;

- Concerns that under the original structure Solaria India could not operate on a stand-alone basis without significant need for ongoing support from Solaria for technical, administrative, sales and marketing functions;

- The existence of senior secured debt at the Solaria Corporation level that would have posed a significant obstacle to OPIC's security interests, including with respect to intellectual property rights; and

- Steep and unforeseen declines in the pricing of solar panels which was expected to have a significant negative impact on Solaria's financial prospects.

Under the terms of the Commitment Letter, OPIC has always had the right to terminate the Commitment Letter if, "*in its sole judgment*," OPIC determined, among other things, that there had been a material adverse change in Solaria's "business, operations, property, condition (financial or otherwise) or prospects" or if OPIC was "not satisfied with the results of its due diligence investigation."

Over the course of many months, rather than exercising its right to unilaterally terminate the Commitment Letter as a result of the material issues identified during due diligence, OPIC worked hard with Solaria in trying to achieve a mutually acceptable transaction structure. Indeed, OPIC engaged in numerous discussions with Solaria regarding revised terms and a modified structure. Solaria agreed to updated terms and conditions and on September 7, 2012, at Solaria's request, OPIC's outside counsel distributed for review and comment an initial draft of a loan agreement that represented the culmination of extensive discussions. Upon receiving the draft, Solaria notified OPIC that it would be unable to move forward with the transaction as outlined in the draft loan agreement because of its inability to achieve certain financial and other metrics. In parallel, Solaria notified OPIC that it had made material changes to its business model, including ramping down production in India, seeking potential purchasers for its equipment in India and seeking to license its technology.

Despite the many issues identified throughout the course of due diligence, OPIC remained committed to continuing its due diligence discussions with Solaria in an effort to determine whether it would be possible to structure a transaction that would meet OPIC's minimum underwriting standards. This remained OPIC's posture until September 2012 when Solaria notified OPIC of the material deviations to its business plan (as detailed above) upon which OPIC had based its internal approvals and Solaria proposed loan terms that OPIC could not accept in the context of an early stage borrower in a highly dynamic, competitive market (e.g., no share pledge, no restrictions on Solaria's business lines or models, no material adverse effect clauses, etc.). And now, after OPIC informed Solaria, in writing, that OPIC could not accommodate Solaria's proposed alternate terms as a result of material changes to Solaria's business and prospects (thereby exercising OPIC's unilateral right under the Commitment Letter), Solaria regrettably has decided to demand reimbursement of expenses that are very clearly to be borne by Solaria.

We also take the opportunity to remind you that under the terms of the Commitment Letter, Solaria is jointly and severally liable to pay for all expenses (including fees and expenses for outside legal counsel and consultants) incurred by OPIC in connection with the proposed project. As of today's date, there is an amount outstanding to OPIC's outside counsel of $46,327.80 and to OPIC's market consultant of $10,302. We trust that Solaria will honor its obligations to cover these expenses.

Sincerely,

Don S. De Amicis
Vice President and General Counsel

cc: Elizabeth Littlefield, President & CEO