# Exhibit C



26 July 2013

Mr. Booker Weaver
Contracting Officer
Overseas Private Investment Corporation
1100 New York Avenue, N.W.
Washington, DC 20527-0001

**Also Sent Via Email to booker.weaver@opic.gov**

*RE: Termination Proposal of Solaria Corporation & Solaria India Private Limited Under Commitment to Provide a Credit Facility dated 29 September 2011*

Dear Mr. Weaver:

I am writing on behalf of the Solaria India Private Limited and Solaria Corporation (Solaria) to submit its termination settlement proposal on the above-referenced contract. Solaria is claiming compensation for the costs Solaria incurred to prepare to meet its obligations under the loan contract and to wind-down its operations after the contract was terminated. This comes to a substantial amount of money where OPIC terminated the contract after Solaria had committed millions of dollars to the undertaking. In addition, I am submitting a claim for bad faith termination and for breach of contract. The following brief summary of the contract provides the background needed to understand the expenses incurred. If no satisfactory response is had, Solaria will promptly file suit. I am attaching a copy of the complaint Solaria will file.

Solaria is a California-based producer of solar panels with years of successful experience in the industry, with a product using proven technology, with a first rate management team. By early 2011, Solaria had mapped out a plan to expand by increasing substantially manufacturing at its Indian subsidiary. It successfully raised the needed equity financing and approached OPIC for the needed debt financing. OPIC expressed not only interest, but also great admiration for Solaria's business plan and management team — and this after extensive due diligence and study of Solaria and its plans.

OPIC provided a draft commitment letter and term sheet in order to come to terms on the financing. For several months from May through September 2011, OPIC performed its due diligence and the parties negotiated a term sheet, a term sheet of 18 pages providing all the necessary provisions that would be needed to govern the provision of $30 million in financing. Then in September, OPIC issued a commitment letter with the final version of the term sheet that the parties had agreed to. OPIC specifically represented to Solaria that this was the deal, a representation enforced by OPIC's custom and usage of

*Letter to Mr. Weaver*
*26 July 2013*
*Page 2*

performing extensive due diligence before the issuance of commitment letters and of negotiating the final terms into the term sheet. The fact that OPIC considered the loan agreement as consummated was confirmed by October voice mails left with Solaria by Elizabeth Littlefield's office, congratulating Solaria on the agreement.

One act of OPIC is of especial legal significance. OPIC ordered Solaria to change contract manufacturers to a tier one manufacturer. (Commitment Letter, Annex, section 21, Additional (a).) OPIC gave this order expecting compliance. OPIC gave this order while intimately familiar with each and every aspect of Solaria's business and of the India expansion plans. OPIC gave this order knowing that it would require immediate compliance and would require the expenditure of substantial capital. OPIC well knew that Solaria would necessarily have to undertake immediate production and sales commitments. OPIC gave this order knowing that by complying Solaria was cutting itself off from its ability to obtain debt financing from others. When giving this order, OPIC even gave Solaria further assurances of the loan by promising a 12-month look back in order to cover these expenditures. Solaria complied with the order by making all the financial expenditures imposed by OPIC.

Under the doctrine of implied-in-fact contract, OPIC will be estopped from asserting that it was free to give such an order, but then to unilaterally rescind the loan contact without any responsibility for the consequences of changing its mind.

OPIC, then, proceeded on a course of conduct confirming that the loan deal had been consummated. In the months following September 2011, Solaria complied with all of OPIC's directives. Of great significance is the fact that Solaria complied with the financial directives of OPIC and exceeded all the financial performance parameters that OPIC had ordered. Sales of Solaria's solar panel proceeded just as OPIC had requested—beyond even since Solaria sold out! Solaria's performance in supplying the orders was everything that OPIC had wanted, as verified by OPIC's inspections of the factory and sales plans. Thus, Solaria met all the requirements for the loan as agreed to in September. The compliance is well documented, documentation that OPIC is quite familiar with since it monitored Solaria quite closely.

As OPIC was acutely aware, Solaria had decided to forego alternate sources of debt financing since OPIC had expressed its commitment over and over again. OPIC had even had its senior vice president, James Polan, in April 2012 expressly state that the money would be provided, a promise made at OPIC's Washington, D.C. offices, a promise made to several of Solaria's senior executives. Again in June, OPIC's Jim Polan promised the loan money to Solaria's Board Member Nancy Pfund.

Despite Solaria's success and despite OPIC' promises, OPIC refused to supply the money. OPIC did so knowing that Solaria could have arranged alternative financing if

*Letter to Mr. Weaver*
*26 July 2013*
*Page 3*

OPIC had not made its many 2011 and 2012 promises, alternative financing that it is impossible to obtain on short notice where the amount is for such a sum—$30 million. Given the sold-out state of Solaria's panels, given Solaria's full-throttle production and expenses associated with the new factory OPIC had ordered, the financial consequences of OPIC's sudden refusal were devastating—tens of millions of dollars.

Additional proof of the above is contained in the 9 November letter of Mr. Don De Amicis where he supplies four bullet-pointed, contrived reasons for the refusal. These fabricated reasons are outright misrepresentations and support a claim for bad faith termination. The fact is that OPIC conducted no further due diligence where Solaria had exceeded every single financial and marketing parameter that OPIC had established. In June 2012, OPIC claimed it needed completely different parameters—meaningless parameters only meant to terminate the deal. Ample is the evidence supporting this assertion. The question is raised, why would someone in Mr. De Amicis's position make such misrepresentations in writing? Why would OPIC state in writing new parameters that are so easily shown to be meaningless? The answer is clear—OPIC is quite aware of the damage it has caused Solaria and can only hope that a bravado bluff would scare Solaria off.

The bluff has not worked. Solaria is prepared to file suit and to litigate to completion. As OPIC's financial analysts are well aware, OPIC's conduct has caused substantial damage to Solaria.

Under Federal Acquisition Regulation 49.206-1 & -2, Solaria has the choice to calculate its termination costs either on an inventory basis or a total cost basis. In a gesture of compromise, Solaria offers to settle for the lesser of the two, total cost basis. As you can see from the attached spreadsheets showing our calculations, total cost basis amounts to $28,673,236.81. It consists mainly of the costs to build the India production facility and to build solar panels, minus the cash Solaria received from the sale of inventory and minus the cash Solaria is conservatively likely to receive from the sale of the plant and remaining inventory. Another segment of damages includes the profits that Solaria would have earned on firm sales contracts that Solaria was unable to fulfill. Should you have any questions about these calculations, I would be happy to have our accounting department speak with you.

Please indicate a desire to speak with our accounting department or address any response to this letter to Michael J. Trevelline, Attorney-at-Law, 1823 Jefferson Place, N.W., Washington, D.C. 20036; (202) 737-1139; mjt@mjtlegal.com.

*Letter to Mr. Weaver*
*26 July 2013*
*Page 4*

Very truly yours,

*Daniel S. Shugar* (signature)

Daniel S. Shugar, CEO

2 Attachments:
Spreadsheets of Termination Cost Calculations
Letter from Michael Trevelline Regarding Preserving Evidence

cc:   Mr. Michael J. Trevelline, Esq.