# In the United States Court of Federal Claims

No. 13-949
Filed: September 1, 2015

*******************************************
                                           *

| | |
|---|---|
| * | |
| * | |
| SOLARIA CORPORATION, AND SOLARIA  * | 22 U.S.C. § 2291 *et seq.* (Overseas Private |
| INDIA PRIVATE LIMITED,                * |     Investment Corporation); |
| * | 28 U.S.C. § 1491 (Tucker Act); |
|     Plaintiffs,                   * | 41 U.S.C. § 7102 (Contract Disputes Act); |
| * | Jurisdiction; |
| v.                              * | Motion To Dismiss, |
| * |     RCFC 12(b)(1) (Subject-matter |
| THE UNITED STATES,           * |     jurisdiction), |
| * |     RCFC 12(b)(6) (Failure to state a claim). |
|     Defendant.                 * | |
| * | |
| * | |

*******************************************

**Michael Joseph Trevelline,** Law Office of Michael Trevelline, Washington, D.C., Counsel for Plaintiffs.

**David Alan Levitt,** United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL ORDER

## I.      RELEVANT FACTUAL BACKGROUND.[1]

In 2010, Solaria Corporation, a Delaware Corporation doing business in California, and Soloria India Private Limited (collectively herein "Solaria")[2] developed a business plan to increase production of solar panels in India ("the India Project").  Compl. ¶¶ 1, 13–14.  Between October 2010 and April 2011, Solaria and the Overseas Private Investment Corporation ("OPIC" or "the Government")[3] discussed financing for the India Project.  Compl. ¶¶ 17–19.  In April 2011, Solaria began negotiating a commitment letter for OPIC to provide $30 million in debt financing for the India Project that OPIC allegedly represented would be available in late 2011 or early 2012.  Compl. ¶¶ 25, 27.

Between May and September 2011, OPIC conducted due diligence on the India Project.[4]  In May 2011, an OPIC team led by OPIC's Managing Director, Lynn Tabernacki, visited Solaria's

---

[1] The relevant facts were derived from Plaintiffs' December 3, 2013 Complaint ("Compl.") and the exhibits attached thereto ("Compl. Exs. A–C").  The relevant facts also were derived from portions of the appendix to the Government's April 4, 2014 Motion To Dismiss ("Gov't Mot. App'x 1–277"),  referenced in Plaintiffs' December 3, 2013 Complaint, including:

- Gov't Mot. App'x at 1–26 (Nov. 2010 Solaria India Business Plan).  Compl. ¶ 14 ("Solaria developed a detailed and viable business plan for the India Project, including production, product standards and quality, marketing and sales, [and] finance.").

- Gov't Mot. App'x at 223–24 (Mar. 28, 2012 letter from OPIC to Solaria).  Compl. ¶ 93 ("On March 28, 2012, the parties mutually agreed that the Commitment letter would expire on 31 December 2012 rather than on 30 March 2012.").

- Gov't Mot. App'x at 272 (Sept. 16, 2012 email from OPIC to Solaria).  Compl. ¶ 94 ("On or about September 16, 2012, OPIC notified Solaria that it was withdrawing its commitment[.]").

- Gov't Mot. App'x at 275–77 (Oct. 26, 2012 letter from Solaria to OPIC).  Compl. ¶ 100 ("By letter of 26 October 2012, Solaria wrote to OPIC discussing the loss that OPIC had caused Solaria by reneging on the Commitment Letter promises.").

[2] Solaria Corporation manufactures and sells solar panels; Solaria India Private Limited is a subsidiary that produces solar panels in India.  Compl. ¶¶ 10–11.

[3] OPIC provides commercial loans to facilitate development in less developed countries.  Compl. ¶ 7.

[4] During this period, OPIC allegedly made numerous requests that Solaria upgrade various "capabilities" in India, including sales, marketing, and engineering.  Compl. ¶ 55.  In response, Solaria allegedly expended funds to make these upgrades.  Compl. ¶ 64.  At OPIC's insistence, Solaria changed its manufacturer in India from a small manufacturer to a tier-one manufacturer, increasing the cost of manufacturing a solar panel from $120 to $160.  Compl. ¶¶ 53–54.  Upon

office in Fremont, California for several days.  Compl. ¶¶ 29, 39.  During this visit, Ms. Tabernacki stated that "the results were among the smoothest and strongest OPIC had ever had from a due diligence investigation" and that she would recommend approval of the India Project.  Compl. ¶¶ 40–41.  Ms. Tabernacki also stated that: she could not recall a time when a commitment letter was executed but a loan was not approved; and Solaria could expect financing within two months of the commitment letter's execution.  Compl. ¶¶ 42–44.

In September 2011, Ms. Tabernacki advised Solaria that the final step was for two OPIC committees—the Investment Committee and the Credit Committee—to approve the loan.  Compl. ¶¶ 47–48.  In late September 2011, Ms. "Tabernacki told Solaria that the two committees had approved Solaria's loan so that the [c]ommitment [l]etter served as a confirmation that the loan was approved, despite the sentence in the [c]ommitment [l]etter providing an expiration date." Compl. ¶ 49.

On September 29, 2011, OPIC completed its due diligence investigation, with the exception of monitoring Solaria's compliance with requested changes, production metrics, review by an independent engineering firm, and review by an independent marketing consultant.  Compl. ¶ 31.[5]

On September 29, 2011, the parties executed a Commitment Letter that provided:

> This letter . . . and the Summary of Terms and Conditions . . . constitute and set forth the terms and conditions of OPIC's commitment to provide to the Borrower . . . a loan facility in the aggregate principal amount of up to US$30,000,000 (the "Credit Facility").  OPIC is willing to provide the Credit Facility on the terms and conditions set forth in this Commitment Letter.  By signing this Commitment Letter, (i) the Borrower confirms that it is willing to borrow a loan or loans . . . under the Credit Facility on the terms and conditions set forth herein, and (ii) Solaria Corporation . . . acknowledges and agrees to their obligations hereunder.

> * * *

> If for any reason the Loan Agreement is not executed and delivered on or before March 30, 2012, OPIC's obligations hereunder shall terminate.  In addition, by written notice to the Borrower and the Sponsor, OPIC may, at any time, terminate its obligations hereunder and pursue any rights and remedies then available to OPIC upon the occurrence of any of the following:  (a) the Sponsor or the Borrower fails or refuses to comply in a timely manner with any of the terms, provisions, or conditions of this Commitment Letter; (b) OPIC, in its sole judgment, determines that a material adverse change has occurred or is reasonably likely to occur . . . ; or (e) OPIC, in its sole judgment, is not satisfied with the results of its due diligence

---

imposing this requirement, OPIC informed Solaria that "OPIC was giving Solaria a 12-month look-back period for the costs of complying[.]"  Compl. ¶ 60.

[5] On an unspecified date, Solaria submitted documentation confirming its compliance with the requested changes.  Compl. ¶¶ 32–34.

investigation.  Upon any such termination . . . the Borrower or the Sponsor shall pay to OPIC on demand any fees, expenses, or other amounts then due hereunder.

Compl. Ex. A at 2, 4.

The September 29, 2011 Commitment Letter also contained a "Summary of Terms and Conditions," including a list of eighteen "Conditions Precedent to Initial Disbursement."  Compl. Ex. A at 6–23.  After executing the September 29, 2011 Commitment Letter, OPIC officials, including Ms. Tabernacki, Michael Ratliff, and James Polan,[6] assured Solaria that the financing would be provided shortly.  Compl. ¶¶ 68–69.

In December 2011, Solaria elected not to pursue additional sources of debt financing. Compl. ¶ 87.

On March 28, 2012, Solaria and OPIC agreed to extend expiration of the September 29, 2011 Commitment Letter from March 30, 2012 to December 31, 2012.  Compl. ¶ 93 ("On March 28, 2012, the parties mutually agreed that the Commitment letter would expire on 31 December 2012 rather than on 30 March 2012."); Gov't Mot. App'x at 223–24 (Mar. 28, 2012 letter from OPIC to Solaria).

On April 5, 2012, Mr. Polan advised Solaria officials that "the deal was done," and he "personally guarantee[d] th[e] loan [would] be completed."  Compl. ¶¶ 77–78.  Mr. Polan added that "it was a matter of completing the paperwork and formalities" and apologized for the delay. Compl. ¶¶ 79–80.

On May 10, 2012, Nancy Pfund, a member of Solaria's Board of Directors, met with Mr. Polan in Washington, D.C.  Compl. ¶ 84.  "At the meeting, [Mr.] Polan expressed . . . his satisfaction that the loan was continuing to move forward, and stated that OPIC was happy with the progress and results of the India Project thus far, since Solaria had exceeded all goals set by OPIC."  Compl. ¶ 85.

On September 16, 2012, however, OPIC informed Solaria that it was withdrawing its loan commitment:

We agree that the continuing dramatic deterioration in panel [prices] poses a significant challenge to all manufacturers, including Solaria, and . . . the situation would appear to make it very challenging for Solaria to stay on the business plan that was the basis for our credit approval and for the term sheet agreed between Solaria and OPIC.

\* \* \*

---

[6] Mr. Polan is Solaria's Senior Vice President.  Compl. Ex. C at 3.  The court was not able to ascertain Mr. Ratliff's title in any of the relevant documents.

> We cannot provide a typical OPIC loan as it will limit your agility in responding to market movements; and we cannot provide a more flexible solution as it would be a far greater risk than OPIC could accept.

Gov't Mot. App'x at 272.

On October 26, 2012, Solaria responded, describing the loss that OPIC's withdrawal from the September 29, 2011 Commitment Letter caused Solaria. Compl. ¶ 100. The October 26, 2012 letter also stated that: Solaria was seeking to recover the out-of-pocket costs it incurred to secure the OPIC loan; and if Solaria did not receive $658,523 by November 9, 2012, it would pursue litigation. Gov't Mot. App'x at 275–77.

On November 9, 2012, OPIC advised Solaria that OPIC "insists in its contractual documentation that customary conditions precedent be met before OPIC will agree to disburse funds in connection with an OPIC-financed structure . . . . [T]hroughout the Solaria diligence process OPIC became aware of certain facts that called into question the viability of the proposed transaction as initially conceived." Compl. Ex. B at 2–3; *see also* Compl. ¶ 102. OPIC considered changes to Solaria's business model, concerns that Solaria India would not be able to operate on a stand-alone basis without significant support from Solaria, potential threats to OPIC's security interests, and declining prices of solar panels. Compl. Ex. B at 3 (Nov. 9, 2012 letter) (quoting Sept. 29, 2011 Commitment Letter's statement that OPIC had the right to terminate the Sept. 29, 2011 Commitment Letter "in its sole judgment" if it: determined that there had been a "material adverse change"; or was "not satisfied with the results of its due diligence investigation") (emphasis omitted).

On July 26, 2013, Solaria sent OPIC a Termination Proposal, "claiming compensation for the costs Solaria incurred to prepare to meet its obligations under the loan contract and to wind-down its operations after the contract was terminated." Compl. Ex. C at 2. The July 26, 2013 Termination Proposal also alleged "bad faith termination" and "breach of contract" claims and informed OPIC that, "[i]f no satisfactory response is had, Solaria will promptly file suit." Compl. Ex. C at 2.

## II.   PROCEDURAL HISTORY.

On December 3, 2013, Solaria ("Plaintiffs") filed a Complaint ("Compl.") in the United States Court of Federal Claims, alleging eight counts: (1) "[f]ailure to pay appropriate termination for convenience costs"; (2) "[t]ort of fraud committed in performance of the Commitment Letter contract"; (3) "[b]reach of contract"; (4) "[b]reach of implied-in-fact contract"; (5) "[i]mplied-in-fact equitable estoppel"; (6) "[b]reach of duty of good faith [and] fair dealing"; (7) "[d]eclaratory relief"; and (8) "[b]ad faith denial"; and seeking $28,673,236.81 in damages. Compl. ¶¶ 91–156. On that same day, the case was assigned to the Honorable Francis M. Allegra.

On January 6, 2014, the court entered a Special Procedures Order.

On January 16, 2014, the Government filed a Motion For Extension Of Time To File A Response, and on January 17, 2014, the court granted the Government's January 16, 2014 Motion.

On April 4, 2014, the Government filed a Motion To Dismiss ("Gov't Mot."), pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). On May 5, 2014, Plaintiffs filed a Response ("Pl. Resp."). On May 22, 2014, the Government filed a Reply ("Gov't Reply").

On January 30, 2015, the court entered an Order scheduling oral argument for March 2, 2015.

On February 26, 2015, the court entered an Order that informed the parties that the court "w[ould] not convert any portion of the [Government's April 4, 2014 M]otion [To Dismiss] into one for summary judgment under RCFC 56." Dkt. No. 13, at 1.

On March 2, 2015, the court entered an Order that rescheduled oral argument for March 12, 2015. On March 9, 2015, the court entered an Order that rescheduled oral argument for March 18, 2015. On March 18, 2015, the court held oral argument on the Government's April 4, 2014 Motion To Dismiss by telephone.

On June 23, 2015, the case was reassigned to the undersigned judge.

## III.   DISCUSSION.

### A.   Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act. . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'") Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government[.]" *Testan*, 424 U.S. at 400. And, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

Whether the court has jurisdiction to adjudicate the claims alleged in the December 3, 2013 Complaint is discussed more fully herein.

### B.     Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Standing must be determined "as of the commencement of suit."  *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992)).  The party invoking federal jurisdiction bears the burden of establishing standing.  *See Lujan*, 504 U.S. at 560–61.  Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180–81 (2000) (citations omitted).

The December 3, 2013 Complaint alleges that Plaintiffs suffered monetary injury that is concrete, particularized, and fairly traceable to OPIC's actions.  Compl. ¶¶ 112–16.  Any financial injury established by Plaintiffs also can be redressed by a monetary award.  For these reasons, the court has determined that Plaintiffs have standing to seek adjudication of the claims alleged in the December 3, 2013 Complaint.

### C.     Standards Of Review For A Motion To Dismiss.

#### 1.     Under RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . . is properly raised by a [Rule] 12(b)(1) motion[.]"  *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading. . . .  But a party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction[.]").  When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations of the complaint to be true and to draw all reasonable inferences in plaintiff's favor."  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

#### 2.     Under RCFC 12(b)(6).

A challenge to the United States Court of Federal Claims' "[ability] to exercise its general power with regard to the facts peculiar to the specific claim . . . is raised by a [Rule] 12(b)(6) motion[.]"  *Palmer*, 168 F.3d at 1313; *see also* RCFC 12(b)(6) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading . . . .  But a party may assert the following defenses by motion: . . . (6) failure to state a claim upon which relief can be granted[.]").

When considering whether to dismiss an action for failure to state a claim, the court must assess whether "a claim has been stated adequately" and then whether "it may be supported by [a] showing [of] any set of facts consistent with the allegations in the complaint."  *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The plaintiff's factual allegations must be substantial enough to raise the right to relief "above the speculative level." *Id.* at 555. The court must accept all factual allegations in the complaint as true and make all reasonable inferences in favor of the plaintiff. *Id.*

### D.     The Government's April 4, 2014 Motion To Dismiss.

The Government argues that the court "lacks subject matter jurisdiction over Counts I, II, V, and VII of the [December 3, 2013 C]omplaint, and Counts III, IV, VI, and VIII fail to state a claim upon which relief can be granted." Gov't Mot. at 2. The court first will address the Government's arguments regarding failure to state a claim, pursuant to RCFC 12(b)(6), and then will address the Government's arguments regarding subject matter jurisdiction, pursuant to RCFC 12(b)(1).

### 1.     Whether The December 3, 2013 Complaint States A Claim Upon Which Relief Can Be Granted.

#### a.     Count III—Breach Of Contract.

#### i.     The Government's Argument.

The Government argues that Count III of the December 3, 2013 Complaint fails to state a claim.

> The clear and unambiguous provisions of the Commitment Letter demonstrate that it was not a Loan Agreement itself—rather, the Commitment Letter discussed terms that would be included in a Loan Agreement that had not yet been drafted—and that OPIC could withdraw from the Commitment Letter for any number of reasons and could do so in *its sole judgment*. Moreover, if any of the eighteen separate conditions precedent were not satisfied, the loan disbursements would not be issued. Plaintiffs concede that all of the conditions precedent had not been satisfied.

Gov't Mot. at 22–23 (emphasis in original) (citing Compl. ¶ 66 (conceding that "ministerial conditions" had not been satisfied)).

According to the Government, "a conditional commitment like the one . . . in the [C]ommitment [L]etter is not a binding contract to make a loan. Rather, it is a binding contract to *consider* making a loan." Gov't Reply at 8 (emphases in original) (citing *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1056–58 (7th Cir. 1988) ("[T]he qualified commitment letter . . . only bound [the defendant] to *consider* lending [the plaintiff] money. . . . [T]his construction is in keeping with the function and reason for a conditional letter of commitment—to provide the initial framework from which the parties might later negotiate a final loan agreement[.]") (emphasis in original)).

As evidenced by the title, "Indicative Terms and Conditions for the Proposed Direct Loan Transaction," the September 29, 2011 Commitment Letter is not a loan agreement. Gov't Mot. at 23. Instead, it explains that "[t]he terms and conditions of the Loan shall be set forth in a definitive loan agreement between OPIC and the Borrower ('the Loan Agreement')[.]" Compl. Ex. A at 13.

And, the September 29, 2011 Commitment Letter contained an automatic termination clause stating, "If for any reason the Loan Agreement is not executed and delivered on or before March 30, 2012, OPIC's obligations hereunder shall terminate." Compl. Ex. A at 4; *see also* Compl. ¶ 93 ("On March 28, 2012, the parties mutually agreed that the Commitment letter would expire on 31 December 2012 rather than 30 March 2012."); Gov't Mot. App'x at 223–24 (Mar. 28, 2012 letter from OPIC to Plaintiffs).  Also, according to the Government, "[t]he fact that the only executed agreement between the parties would terminate within a matter of months demonstrates that the Commitment Letter could not be interpreted as a Loan Agreement." Gov't Mot. at 24.

The September 29, 2011 Commitment Letter "allows OPIC to withdraw from its commitment for a number of reasons." Gov't Mot. at 24 (citing Compl. Ex. A at 4 ("OPIC may, at any time, terminate its obligations hereunder and pursue any rights and remedies then available to OPIC upon the occurrence of any of the following:  (a) the Sponsor or the Borrower fails or refuses to comply in a timely manner with any of the terms, provisions, or conditions of this Commitment Letter; (b) OPIC, in its sole judgment, determines that a material adverse change has occurred or is reasonably likely to occur . . . ; or (e) OPIC, in its sole judgment, is not satisfied with the results of its due diligence investigation.")); *see also* Gov't Reply at 8 ("[W]hether [Plaintiffs] complied with the terms of the [C]ommitment [L]etter or not, OPIC, in its sole discretion, had the right to terminate the [C]ommitment [L]etter.").  As such, Plaintiffs "assumed the risk" that OPIC would withdraw.  Gov't Reply at 8; *see also* Gov't Reply at 9 ("Even though [Plaintiffs] contend[] that economic conditions were still favorable for the [India P]roject's potential success at the time OPIC cancelled the commitment, this, too, was for OPIC, not [Plaintiffs], to decide.").

In addition, the December 3, 2013 Complaint "does not and cannot allege that [Plaintiffs] satisfied *all* the conditions precedent," as required by the September 29, 2011 Commitment Letter, and alleges only that they complied with the "relevant" and "non-ministerial" provisions.  Gov't Mot. at 26 (emphasis in original).  Even if Plaintiffs satisfied all the conditions precedent, this "was a necessary but not sufficient condition for OPIC to agree to move forward on the loan," because OPIC still had an "absolute right to cancel the [C]ommitment [L]etter in its sole discretion." Gov't Reply at 10.  In any event, when OPIC sought to restructure the September 29, 2011 Commitment Letter, Plaintiffs refused and aborted the India Project.  Gov't Reply at 10–11.  As a result, the September 29, 2011 Commitment Letter expired, terminating OPIC's obligation to consider making a loan.  Gov't Reply at 11.[7]

Therefore, Count III should be dismissed for failure to state a claim upon which relief can be granted.  Gov't Mot. at 26.

### ii.    Plaintiffs' Response.

Plaintiffs respond that the September 29, 2011 Commitment Letter is a binding contract, because a meeting of the minds occurred.  Pl. Resp. at 14.  "All agreements have some degree of indefiniteness and some degree of uncertainty." Pl. Resp. at 15 (citing RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. a ("[T]he actions of the parties may show conclusively that they have

---

[7]  In fact, OPIC's September 16, 2012 email evidences that it withdrew the loan commitment earlier.  Compl. ¶ 88; Gov't Mot. App'x at 272.

intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon.  In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.")).  And, "OPIC . . . has not managed to point to a single term that would be in the final loan agreement that the parties have a disagreement about or that is unclear in the Commitment Letter."  Pl. Resp. at 15–16.  As such, "discovery [will] demonstrate that OPIC was fabricating its concerns in order to end the loan for political reasons," not due to a "dispute about how to interpret or implement a term in the Commitment Letter loan agreement[.]"  Pl. Resp. at 17.

In sum, Plaintiffs fulfilled all of the conditions in the September 29, 2011 Commitment Letter.  Pl. Resp. at 18.  "No reason exists for OPIC to have found either a material adverse change or unsatisfactory due diligence."  Pl. Resp. at 19.  And, even if OPIC identified a material change, the specific terms of agreement would govern over the more general language granting OPIC discretion to withdraw.  Pl. Resp. at 20.  As such, OPIC "fail[ed] to negotiate in good faith," constituting a breach of contract.  Pl. Resp. at 19.

### iii.    The Court's Resolution.

As a preliminary matter, the court must determine whether the September 29, 2011 Commitment Letter was a contract.  "The elements necessary to determine that a contract exists are . . . . (1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance."  *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003).  And, "[w]hen the United States is a party, a fourth requirement is added: the [G]overnment representative whose conduct is relied upon must have actual authority to bind the [G]overnment in contract."  *Id.*  In this case, the parties agree that the September 29, 2011 Commitment Letter is a contract.  *See* Gov't Reply at 8 (stating that the September 29, 2011 Commitment Letter "is a binding contract to *consider* making a loan") (emphasis in original); Pl. Resp. at 14 (stating that the September 29, 2011 Commitment Letter represented a "meeting of the minds").  The September 29, 2011 Commitment Letter evidences the four necessary elements of a Government contract, because the parties demonstrated: (1) mutuality of intent to contract by agreeing that the September 29, 2011 Commitment Letter "shall constitute an effective and legally binding agreement among [the parties]" and signing thereto (Compl. Ex. A at 6); (2) consideration by "OPIC's commitment to provide . . . a loan facility" and Plaintiffs' agreement to repay the loan, including interest and fees (Compl. Ex. A at 2–3); (3) lack of ambiguity in offer and acceptance by stating that "OPIC is willing to provide the Credit Facility" and that "the Borrower confirms that it is willing to borrow a loan or loans" (Compl. Ex. A at 2); and (4) authority to bind the Government by having Ms. Tabernacki, OPIC's Managing Director, sign the September 29, 2011 Commitment Letter (Compl. Ex. A at 6).

Next, the court must determine whether OPIC breached the September 29, 2011 Commitment Letter.  "A breach of contract claim requires two components: (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty."  *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) ("To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.")).

First, to identify the "obligation or duty arising out of the contract," the court must interpret the September 29, 2011 Commitment Letter. "In interpreting a contract, [the court] begin[s] with the plain language," and "interpret[s] the contract in a manner that gives meaning to all of its provisions and makes sense." *Massie v. United States*, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (citations omitted). The plain language of the September 29, 2011 Commitment Letter expressly provides that it is not a loan agreement but only provides the terms if an agreement is reached. Compl. Ex. A at 4 ("If for any reason the Loan Agreement is not executed and delivered on or before [December 31, 2012], OPIC's obligations hereunder shall terminate."); Compl. Ex A at 8 (entitling the term sheet as "Indicative Terms and Conditions for the *Proposed* Direct Loan Transaction") (emphasis added); Compl. Ex. A at 13 ("The terms and conditions of the Loan shall be set forth in a definitive loan agreement between OPIC and the Borrower ('the Loan Agreement')[.]"). In addition, OPIC's obligation to make the loan was subject to OPIC's "sole" determination that Plaintiffs fulfilled certain conditions prior to December 31, 2012. Compl. Ex. A at 4. Therefore, the September 29, 2011 Commitment Letter only bound OPIC to negotiate a potential loan agreement, subject to Plaintiffs' fulfillment of certain conditions to OPIC's satisfaction and the execution of a loan agreement prior to a specific date.

Second, as to the "factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty," the court must determine whether Plaintiffs alleged sufficient facts to support a claim that OPIC breached its duty. *See Twombly*, 550 U.S. at 555 (holding that the plaintiff's factual allegations, making all reasonable inferences in the plaintiff's favor, must be substantial enough to raise the right to relief "above the speculative level"). This requires consideration of OPIC's discretion to terminate the September 29, 2011 Commitment Letter and the reasons proffered by OPIC provided for termination.

In this case, the first paragraph of the September 29, 2011 Commitment Letter provides that it:

> [C]onstitute[s] and set[s] forth the terms and conditions of OPIC's *commitment to provide to the Borrower* . . . a loan facility in the aggregate principal amount of up to US$30,000,000. . . . OPIC is willing to provide the Credit Facility *on the terms and conditions set forth in this Commitment Letter*.

Compl. Ex. A at 2 (emphases added).

Those "terms and conditions" grant OPIC substantial discretion over whether to proceed with the loan:

> If *for any reason the Loan Agreement is not executed* and delivered on or before March 30, 2012, OPIC's obligations hereunder shall terminate. In addition, by written notice to the Borrower and the Sponsor, *OPIC may, at any time, terminate its obligations hereunder* and pursue any rights and remedies then available to OPIC upon the occurrence of any of the following: (a) the Sponsor or the Borrower fails or refuses to comply in a timely manner with any of the terms, provisions, or conditions of this Commitment Letter; (b) OPIC, in its *sole judgment*, determines that a material adverse change has occurred or is reasonably likely to occur . . . ; or (e) OPIC, in its *sole judgment*, is not satisfied with the results of its due diligence investigation.

Compl. Ex. A at 4 (emphases added); *see also* Compl. ¶ 93 ("On March 28, 2012, the parties mutually agreed that the Commitment letter would expire on 31 December 2012 rather than 30 March 2012."); Gov't Mot. App'x at 223–24 (Mar. 28, 2012 letter from OPIC to Plaintiffs).

And, in the November 9, 2012 letter, OPIC provided the following justification for exercising this discretion:

> While not exhaustive, the list below serves as an illustration of the various issues that have arisen through the diligence process since the time of the Commitment Letter:
>
> • Changes to [Plaintiffs'] business model in which [Plaintiffs] desired to expand manufacturing activities into new markets beyond India. This expansion could have potentially eroded the Indian entity's projected cash flows and was inconsistent with the cash flow profile originally approved . . . ;
>
> • Concerns that under the original structure Solaria India could not operate on a stand-alone basis without significant need for ongoing support from Solaria for technical, administrative, sales and marketing functions;
>
> • The existence of senior secured debt at the Solaria Corporation level . . . ; and
>
> • Steep and unforeseen declines in the pricing of solar panels which was expected to have a significant negative impact on Solaria's financial prospects.

Pl. Resp. Ex. B at 3.[8]

Therefore, OPIC properly exercised its discretion to "terminate its obligations" under the September 29, 2011 Commitment Letter, because OPIC determined, "in its sole judgment, [that it was] not satisfied with the results of its due diligence investigation." Compl. Ex. A at 3.

Equally important is the fact that the September 29, 2011 Commitment Letter provided that "[i]f *for any reason* the Loan Agreement is not executed and delivered on or before March 30, 2012, OPIC's obligations hereunder shall terminate." Compl. Ex A at 4 (emphasis added); Compl. ¶ 93 ("On March 28, 2012, the parties mutually agreed that the Commitment letter would expire on 31 December 2012 rather than 30 March 2012."). It is undisputed that the loan agreement was never executed. Therefore, "OPIC's obligations . . . terminate[d]." Compl. Ex. A at 4.

For these reasons, the court has determined that Count III of the December 3, 2013 Complaint does not allege sufficient facts of OPIC's alleged breach of the September 29, 2011

---

[8] In relation to other counts, the December 3, 2013 Complaint alleges that these reasons are false and that OPIC actually decided not to make the loan due to the political controversy stemming from the Solyndra solar panel scandal. Compl. ¶¶ 105–07. But, the December 3, 2013 Complaint does not provide any factual support for this allegation. For these reasons, the court has determined that these contentions do not "rise above the speculative level." *Twombly*, 550 U.S. at 555.

Commitment Letter to raise the right to relief "above the speculative level." *Twombly*, 550 U.S. at 555. As such, Count III is dismissed "for failure to state a claim upon which relief can be granted[.]" RCFC 12(b)(6).

### b.    Count IV—Breach Of Implied-In-Fact Contract.

### i.    The Government's Argument.

The Government argues that "[i]t is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002). "This is true whether or not the alleged express contract advances a viable claim because it depends not on the viability of the express contract but on the fact that the express contract fills the field." Gov't Reply at 12. Counts III and IV allege the same breach—"Count III with respect to an express contract relating to the Loan Commitment . . . and Count IV to an alleged implied-in-fact contact relating to the same Loan Commitment[.]" Gov't Mot. at 29; *see also* Gov't Mot. at 30 (stating that Count IV refers to the "typical corporate loan" referenced in Count III). Therefore, Counts III and IV are "materially indistinguishable and [Count IV], because it duplicates [Count III], must be dismissed." Gov't Mot. at 29 (citing *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1324–28 (Fed. Cir. 1997) (holding that the plaintiff did not show an express or an implied-in-fact contract); *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990) ("[A]n implied-in-fact contract is one founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding.")).

### ii.    Plaintiffs' Response.

Plaintiffs respond that "OPIC seeks to have its cake (the written Commitment Letter is not an enforceable loan agreement) and to eat it too (the contractual terms of the Commitment Letter cover the terms of the loan agreement so that no implied in fact contract can be alleged)." Pl. Resp. at 23 (citing *Trauma Serv.*, 104 F.3d at 1325 (The plaintiff's "complaint alleges that an express and, in the alternative, an implied-in-fact contract underlies its claim. This allegation suffices to confer jurisdiction in the [United States] Court of Federal Claims.")). "If OPIC prevails on [Count III], then the [c]ourt may turn in the alternative to the implied-in-fact contention, just as *Trauma Service*[] contemplates." Pl. Resp. at 24.

### iii.    The Court's Resolution.

As a matter of law, "the existence an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter[.]" *Schism*, 316 F.3d at 1278. As previously discussed, the court has determined that the September 29, 2011 Commitment Letter is an express contract. *See supra* Section III.D.1.a.iii. As such, there can be no implied-in-fact contract, "unless the implied contract is *entirely unrelated* to the express contract." *Schism*, 316 F.3d at 1278 (emphasis added). The December 3, 2013 Complaint's allegations as to the implied-in-fact contract, however, are identical to Plaintiffs' argument in support of an express contract, *i.e.*, the September 29, 2011 Commitment Letter bound OPIC to loan Plaintiffs money for the India Project. Pl. Resp. at 24 ("If OPIC prevails on th[e] argument [that the September 29, 2011

Commitment Letter does not obligate OPIC to enter into a loan agreement], then the [c]ourt may turn *in the alternative* to the implied-in-fact contention, just as *Trauma Service*[]⁹ contemplates.") (emphasis added).

If, *arguendo*, an implied-in-fact contract claim is not precluded, Plaintiffs must establish the existence of an implied-in-fact contract by showing "(1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance," as well as the "fourth requirement" that "the [G]overnment representative whose conduct is relied upon [has] actual authority to bind the [G]overnment in contract." *D & N Bank*, 331 F.3d at 1378; *see also Atlas*, 895 F.2d at 754 ("[A]n implied-in-fact contract is one founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding.") (citation omitted). But, Plaintiffs do not argue the existence of an implied-in-fact contract distinct from the September 29, 2011 Commitment Letter, and a "meeting of the minds" between the parties *was* "embodied in an express contract," *i.e.*, the September 29, 2011 Commitment Letter. And, the court already has determined that Plaintiffs did not allege sufficient facts of OPIC's alleged breach of the September 29, 2011 Commitment Letter to raise the right to relief "above the speculative level." *Twombly*, 550 U.S. at 555.

For these reasons, the court has determined that the December 3, 2013 Complaint does not allege sufficient facts of OPIC's alleged breach of an implied-in-fact contract to raise the right to relief "above the speculative level." *Twombly*, 550 U.S. at 555. As such, Count IV is dismissed "for failure to state a claim upon which relief can be granted[.]" RCFC 12(b)(6).

    **c.**    **Count VI—Breach Of Duty Of Good Faith And Fair Dealing And Count VIII—Bad Faith Denial.**

    **i.**    **The Government's Argument.**

The Government argues that Counts VI and VIII, regarding the duty of the good faith and fair dealing and bad faith denial, "do not show that OPIC breached its duty of good faith and fair dealing and, therefore, these counts must be dismissed." Gov't Mot. at 34.

"[A]lthough couched in terms of a breach of the implied duty of good faith and fair dealing, the allegations really charge OPIC with bad faith termination. This however, requires a specific intent by OPIC to injure [Plaintiffs]." Gov't Mot. at 35 (citing *Kalvar Corp. v. United States*, 211 Ct. Cl. 192, 199 (1976) ("[S]pecific intent to injure the plaintiff" is required to demonstrate a

---

⁹ Plaintiffs correctly represent that *Trauma Service* may authorize courts to adjudicate claims when a plaintiff argues, in the alternative, that if no express contract exists, in an implied-in-fact contract exists. *See Trauma Serv.*, 104 F.3d at 1325 (The plaintiff's "complaint alleges that an express and, in the alternative, an implied-in-fact contract underlies its claim. This allegation suffices to confer jurisdiction in the [United States] Court of Federal Claims."). But, the *Trauma Service* court dismissed the complaint for failure to state a claim. *See id.* at 1327–28 (finding that the plaintiff could not "show either an express of implied-in-fact contract" and dismissing for "failure to state a claim"). Likewise here, an express contract exists, but Plaintiffs did not allege sufficient facts to support a finding that OPIC breached the express contract.

breach of the duty of good faith and fair dealing.)).  The December 3, 2013 Complaint, however, does not allege specific intent to injure Plaintiffs but instead alleges that OPIC's actions constitute bad faith.  Gov't Mot. at 36–38.

Again, the September 29, 2011 Commitment Letter only obligated OPIC to negotiate towards a loan agreement, so "OPIC's 'refusal' to provide [Plaintiffs] with $30 million of public money is not sufficient evidence to establish a breach of the covenant of good faith and fair dealing."  Gov't Mot. at 36 (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2013) (holding that "the duty's focus [is] on 'faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party'")).  Regarding Plaintiffs' allegations as to a "look-back provision" and the applicability of New York law, Plaintiffs explicitly agreed to those provisions and cannot now claim that they constitute a violation of the duty of good faith and fair dealing or of bad faith.  Gov't Mot. at 38–39; *see also* Gov't Reply at 15 ("Surely, representing that New York law applied when it did apply is not and cannot be a breach of the implied covenant of good faith and fair dealing, because the act is simply the act of giving honest advice concerning the content of the [C]ommitment [L]etter.").  In addition, OPIC was not responsible for ensuring that Plaintiffs did not invest the potential loan funds prior to closing, since Plaintiffs were aware that OPIC might decide not to make the loan.  Gov't Reply at 16.  "OPIC simply exercised an express right in the [C]ommitment [L]etter."  Gov't Reply at 16.

### ii.     Plaintiffs' Response.

Plaintiffs respond that OPIC violated the duty of good faith and fair dealing "[b]y having [Plaintiffs] spend $30 million to change to a tier one manufacturer, implement a marketing program, begin production and meet control requirements[.]"  Pl. Resp. at 29.  Although OPIC had discretion to terminate the September 29, 2011 Commitment Letter, "it was implicit that OPIC would exercise its sole discretion in a manner consistent with the purpose of the commitment."  Pl. Resp. at 28.  Instead, OPIC's actions "frustrated the purpose of the commitment."  Pl. Resp. at 28.  In particular, OPIC "contrive[d] various excuses to cancel the loan rather than informing [Plaintiffs] that OPIC had changed its mind."  Pl. Resp. at 29.  And, OPIC misrepresented the applicable law by stating that New York law did not apply.  Pl. Resp. at 27.

In addition, OPIC's November 9, 2012 letter demonstrates specific intent to injure Plaintiffs, because "OPIC cancelled the loan for reasons outside the purview of the Commitment Letter—political embarrassment[.]"  Pl. Resp. at 31.  "OPIC did not want the circumstances of the loan to be publicized, but rather contrived false reasons to end the loan."  Pl. Resp. at 32. Therefore, OPIC acted in bad faith.  Pl. Resp. at 30.

### iii.     The Court's Resolution.

As a matter of law, the covenant of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  Both the "duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing."  *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010). "What is promised or disclaimed in a contract helps define what constitutes 'lack of diligence and

interference with or failure to cooperate in the other party's performance.'" *Metcalf*, 742 F.3d at 991 (quoting *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988)).

The United States Court of Appeals for the Federal Circuit has defined the parameters of the implied duty of food faith and fair dealing as follows:

> [T]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions. Although in one sense any "implied" duty "expands" the "express" duties, our formulation means simply that an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision. The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value.

*Metcalf*, 742 F.3d at 991 (citations omitted).

The implied duty of good faith and fair dealing "depends on the parties' bargain in the particular contract at issue." *Id.* at 994. And, "a breach of the *implied* duty of good faith and fair dealing does not require a violation of an *express* provision in the contract." *Id.* (emphasis in original).

In this case, the parties never reached a formal loan agreement, and the September 29, 2011 Commitment Letter did not obligate OPIC to loan money to Plaintiffs. Instead, OPIC was obligated to negotiate with Plaintiffs, and if certain conditions were fulfilled to OPIC's satisfaction by December 31, 2012, to proceed towards a loan agreement. Compl. Ex. A at 2, 4. Pursuant to the September 29, 2011 Commitment Letter, OPIC conducted due diligence, exercised its "sole judgment" not to proceed with the loan, and provided a detailed explanation of its decision. Compl. Ex. A at 4; Compl. Ex. B at 3. Therefore, determining that OPIC was required to enter into a loan agreement would "expand [OPIC's] contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Metcalf*, 742 F.3d at 991.

For these reasons, the court has determined that the December 3, 2013 Complaint does not allege sufficient facts of OPIC's alleged breach of the implied duty of good faith and fair dealing to raise the right to relief "above the speculative level." *Twombly*, 550 U.S. at 555.[10] As such, Counts VI and VIII are dismissed for "failure to state a claim upon which relief can be granted[.]" RCFC 12(b)(6).

---

[10] Plaintiffs also have failed to allege sufficient facts of "some specific intent to injure" Plaintiffs by OPIC. *Kalvar Corp.*, 211 Ct. Cl. at 199.

2.      **Whether The Court Has Jurisdiction To Adjudicate Counts I, II, V, And VII Of The December 3, 2013 Complaint.**

a.      **Count I—Failure To Pay Appropriate Termination For Convenience Costs.**

i.      **The Government's Argument.**

The Government argues that the court does not have jurisdiction to adjudicate Count I, concerning failure to pay costs for a termination for convenience. Gov't Mot. at 16–18. The loan "OPIC contemplated making to [Plaintiffs] is not subject to the [Contracts Disputes Act ('CDA')], because a loan is not a procurement of property or services." Gov't Mot. at 17 (citing 41 U.S.C. § 7102(a)[11]; *see also New Era Constr. v. United States*, 890 F.2d 1152, 1157 (Fed. Cir. 1989) (explaining that "procurement" is the "acquisition by purchase, lease or barter, of property or services for the *direct benefit or use* of the Federal Government") (emphasis in original); *Laudes Corp. v. United States*, 86 Fed. Cl. 152, 161 (2009) (stating that the CDA "extends only to the *procurement* of services by the Government and not the *provision* of such services") (emphasis in original)). Here, "OPIC did not procure a service but, instead, provided a service, namely offering the loan for [Plaintiffs] to invest in its facility in India." Gov't Reply at 5.

In addition, "[l]ike in *New Era Construction*, the loan commitment was to enable [Plaintiffs] to expand [their] India facility, not to enable OPIC to procure property or services. Only [Plaintiffs] stood to benefit directly from the funds, not OPIC." Gov't Mot. at 18; *see also* Gov't Reply at 3–4 (same). "[T]he direct benefit has to come from the use of the loan itself, not the funds that come from paying the loan (*i.e.* interest)." Gov't Reply at 4. And, any intangible benefits OPIC could potentially realize are insufficient to constitute a procurement. Gov't Mot. at 18 (citing *Fla. Power & Light Co. v. United States*, 307 F.3d 1364, 1373–74 (Fed. Cir. 2002) (holding that the United States Court of Federal Claims did not have jurisdiction, pursuant to the CDA, to adjudicate claims arising from a contract under which the Government enriched uranium for utility companies); *Laudes Corp.*, 86 Fed. Cl. at 161("Intangible forms of consideration, such

---

[11] Section 7102(a), in relevant part, provides:

Executive agency contracts. Unless otherwise specifically provides in this chapter, this chapter applies to any express or implied contract . . . made by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair, or maintenance of real property; or

(4) the disposal of personal property.

41 U.S.C. § 7102(a).

as bailment contracts, contracts for uranium enrichment services, and guarantees of government money orders, do not qualify as 'procurements' under the CDA.")).

In sum, since the September 29, 2011 Commitment Letter is not subject to the CDA, the court does not have subject matter jurisdiction to adjudicate Count I of the December 3, 2013 Complaint. Gov't Mot. at 18.

### ii.     Plaintiffs' Response.

Plaintiffs respond that "none of the cases quoted by [the Government] address the question [of] whether the interest paid to the Government under a loan contract constitutes 'property or services for the direct benefit or use of the Federal Government'—the key CDA language." Pl. Resp. at 9. The September 29, 2011 Commitment Letter "provides for large interest payments to be made to the U[nited] S[tates] Government," and OPIC "generated $426 million in profits last year" from these payments. Pl. Resp. at 10. Thus, the court must determine "whether interest payments paid to OPIC constitute property for the direct benefit of the Government." Pl. Resp. at 10. And, the interest payments are clearly property. Pl. Resp. at 10–11.[12]

### iii.    The Court's Resolution.

Section 7102(a) of the CDA applies to "(1) the *procurement* of property, other than real property in being; (2) the *procurement* of services; (3) the *procurement* of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property." 41 U.S.C. § 7102(a) (emphases added). A procurement is characterized by "the acquisition by purchase, lease or barter, of property or services for the *direct benefit or use* of the Federal Government[.]" *New Era*, 890 F.2d at 1157 (citation omitted) (emphasis in original); *see also Delta S.S. Lines, Inc. v. United States*, 3 Cl. Ct. 559, 569 (1983) ("It is . . . the conventional contract for the direct procurement of property, services and construction, to be used directly by the Government, which is the type of Government contract covered by the Act.").

Again, in this case, OPIC was neither procuring services nor receiving any direct benefit from Plaintiffs. Instead, if Plaintiffs were approved, OPIC would provide Plaintiffs with a loan commitment, but Plaintiffs would be required to reimburse OPIC for the loan, as well as the associated interest and fees. Compl. Ex. A at 1. Therefore, the December 3, 2013 Complaint does not allege a claim under the CDA. *See* 41 U.S.C. 7102(a); *see also New Era*, 890 F.3d at 1157.

For these reasons, the court has determined that it does not have jurisdiction under the CDA to adjudicate Count I of the December 3, 2013 Complaint. As such, Count I is dismissed. *See* RCFC 12(b)(1).

---

[12] In the argument heading, Plaintiffs state that the court has jurisdiction to adjudicate Count I under the Tucker Act, 28 U.S.C. § 1491, but Plaintiffs do not provide any argument in support. To the extent that the court construes Count I as a breach of contract claim under the Tucker Act, this claim would be duplicative of Count III that alleges breach of contract, *i.e.*, the September 29, 2011 Commitment Letter that the court has dismissed. *See supra* Section III.D.1.a.iii.

**b.     Count II—Tort Of Fraud Committed In Performance Of The Commitment Letter Contract.**

**i.     The Government's Argument.**

The Government argues that for the court to adjudicate tort claims, "there must be a direct connection between the Government's contractual obligations and the alleged tortious conduct." *H.H.O., Inc. v. United States*, 7 Cl. Ct. 703, 706 (1985); *see also C.B.C. Enters., Inc. v. United States*, 24 Cl. Ct. 1, 4, (1991) (same); *Summit Contractors, Inc. v. United States*, 22 Cl. Ct. 54, 56 (1990) ("[T]he court must . . . distinguish between tort claims connected to a contract and tort claims independent of a contract.").

In this case, "OPIC rejected [Plaintiffs'] unrestricted loan proposal prior to the alleged misrepresentations." Gov't Mot. at 19. As such, "[t]hese alleged misrepresentations were . . . unrelated to performance of the commitment," and "there is no 'contract performance referent[.]'" Gov't Mot. at 19–20 (quoting *C.B.C. Enters., Inc.*, 24 Cl. Ct. at 4); *see also Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 479 (1993) (The "plaintiff's claim for damage to reputation [stemming from a termination for cause] must be denied because it lacks the required direct nexus to the Tucker Act[.]"). The September 29, 2011 Commitment Letter "did not relate to 'a duty whose source was contractual' because it was in response to [Plaintiffs'] claim," and did not "incorporate[] duties relating to the alleged misrepresentations." Gov't Mot. at 21 (citing *Kenny Orthopedic, LLC v. United States*, 83 Fed. Cl. 35, 45–46 (2008) (finding that, because "the tortious interference claims are not tied to specific promises or duties arising from the . . . Contract . . . ., the [Government's] alleged tortious actions . . . did not breach a duty whose source was contractual"); *see also Dakota Tribal Indus. v. United States*, 34 Fed. Cl. 295, 299 (1995) ("Because plaintiff has not shown any provision incorporating any misrepresentations . . . , plaintiff's claims of misrepresentation sound in tort, and the court thus lacks jurisdiction over them, since they do not qualify as claims for tortious breach of contract[.]")); *see also* Gov't Reply at 6 (citing *Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741, 745 (1980) (finding that a claim was justiciable only because the alleged misrepresentation affected performance of the contract)).

Moreover, "[b]y [Plaintiffs'] own admission, the alleged tort did not arise out of OPIC's performance of the contract but, instead, arose as a result of OPIC's alleged effort to hide the reason it terminated the [C]ommitment [L]etter." Gov't Reply at 6.

"Count II alleges an independent tort rather than a tortious breach of the Commitment Letter." Gov't Mot. at 22; Gov't Reply at 6 (same). Therefore, the court does not have jurisdiction to adjudicate Count II of the December 3, 2013 Complaint, regarding the tort of fraud, because "[t]here is no dispute that the Tucker Act does not include claims 'sounding in tort.'" Gov't Mot. at 19.

**ii.     Plaintiffs' Response.**

Plaintiffs respond that, on the November 9, 2012, OPIC made "false, contrived justifications for the breach" of the September 29, 2011 Commitment Letter, amounting to tortious

misrepresentations.  Pl. Resp. at 11.[13]  Contrary to the Government's arguments, "[n]o case holds that post-breach conduct is necessarily unconnected to the contract and so outside the Tucker Act." Pl. Resp. at 12.  Count II "seeks the . . . same contract damages sought in the breach of contract counts, since it alleges misstatements about particular contract provisions . . . [that] were made prior to [the July 26, 2013 Termination Proposal]."  Pl. Resp. at 12.  And, Plaintiffs neither seek future damages nor contend that there were pre-contract misrepresentations.  Pl. Resp. at 13. Therefore, the cases cited by the Government are inapposite.  Pl. Resp. at 13.  Instead, "OPIC breached the contract by misrepresenting its terms."  Pl. Resp. at 14 (citing *Olin Jones Sand*, 225 Ct. Cl. at 745 ("[M]isrepresentations are merely another way of asserting that a breach of contract occurred, [and] the . . . claim is not barred simply because it might also be stated as a tort.")).

### iii.    The Court's Resolution.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States . . . for liquidated or unliquidated damages in cases *not sounding in tort*."  28 U.S.C. § 1491(a)(1) (emphasis added); *see also Shearin v. United States*, 992 F.2d 1195, 1197 (Fed. Cir. 1993) ("It is well settled that the United States Court of Federal Claims lacks . . . jurisdiction to entertain tort claims.").  But, if the "alleged misrepresentations are merely another way of asserting that a breach of contract occurred . . . the claim is not barred simply because it might also be stated as a tort."  *Olin Jones Sand*, 225 Ct. Cl. at 745.  As such, "there must be a direct connection between the Government's contractual obligations and the alleged tortious conduct."  *H.H.O.*, 7 Cl. Ct. at 706.

Here, the alleged misrepresentations are not "merely another way of asserting that a breach of contract occurred."  *Olin Jones Sand*, 225 Ct. Cl. at 745.  Nor is there a "direct connection between the Government's contractual obligations and the alleged tortious conduct."  *H.H.O.*, 7 Ct. Cl. at 706.  And, the court has determined that OPIC did not breach the contract.  *See supra* Section III.D.1.a.iii.

For these reasons, the court has determined that it does not have jurisdiction to adjudicate Count II of the December 3, 2013 Complaint.  As such, Count II is dismissed.  *See* RCFC 12(b)(1).

### c.    Count V—Estoppel.

### i.    The Government's Argument.

The Government argues that, if Count V is construed to allege promissory estoppel, Plaintiffs are "asserting a contract implied in law" over which the court does not have jurisdiction. Gov't Mot. at 31 (citing *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 58 Fed. Cl. 542, 546 (2003) ("This court does not have jurisdiction to hear contract claims based

---

[13] The December 3, 2013 Complaint also alleges that OPIC terminated the September 29, 2011 Commitment Letter to avoid a Congressional inquiry, because "another California producer of solar panels, Solyndra, engaged in unseemly behavior and promoted unworkable technology becoming a national political point of contention," amounting to a tortious breach.  Compl. ¶ 105. But, the court already has determined that OPIC did not breach the contract.  *See supra* Section III.D.1.a.iii.

on promissory estoppel."); *see also Schuhl v. United* States, 3 Cl. Ct. 207, 211 (1983) ("[P]romissory estoppel claims are outside the scope of the Tucker Act, because the [Government] has not waived its sovereign immunity with regard to a promissory estoppel cause of action[.]"); *LaMirage, Inc. v. United States*, 44 Fed. Cl. 192, 200 (1999) ("It is well settled that this court is without jurisdiction to entertain claims arising from a contract, based on the theory of promissory estoppel, or based on, contracts implied-in-law.")).

If Count V is construed to allege equitable estoppel, Plaintiffs "bear[] a heavy burden of proof that the Government is estopped from asserting legal defenses it may have to [Plaintiffs'] claims." Gov't Mot. at 31 (citing *Heckler v. Cmty. Health Servs., Inc.*, 467 U.S. 51, 60 (1984) ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.")); *see also* Gov't Reply at 13 (same). Plaintiffs must show that: "the Government engaged in misleading conduct leading a counterparty to reasonably infer that the rights would not be asserted against it and that the counterparty reasonably relied on the conduct"; and "due to this reliance, material prejudice will afflict the counterparty if the delayed assertion of such rights is permitted." Gov't Mot. at 31–32 (citing *Lincoln Logs, Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992) ("The elements of equitable estoppel are (1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such right is permitted.")).

Here, the December 3, 2013 Complaint does not allege that "OPIC ever stated or acted in a manner that allowed [Plaintiffs] reasonably to believe that OPIC had waived compliance with underwriting standards."[14] Gov't Mot. at 32. In fact, the September 29, 2011 Commitment Letter "requires [Plaintiffs] to satisfy various underwriting standards before OPIC is obligated to fund the loan." Gov't Mot. at 32–33 (citing Compl. Ex. A at 1). Of course, OPIC could not have waived the underwriting standards, because OPIC cannot expend public funds without complying with reasonable underwriting standards. Gov't Mot. at 33 (citing 22 U.S.C. § 2191 (OPIC loans must be based on the "economic and financial soundness of projects[.]")). Therefore, OPIC was entitled to "analyze and assess the documentation as a matter of due diligence so that OPIC could determine if the [India P]roject would be viable given the risks from worsening economic conditions." Gov't Reply at 13.

### ii.    Plaintiffs' Response.

Plaintiffs respond that they are "not seeking to foreclose OPIC from alleging that the underwriting standards had not been met, but [are] seeking to foreclose OPIC from denying that

---

[14] OPIC's underwriting standards are set forth in 22 U.S.C. § 2191 and include various requirements, such as considering the "economic and financial soundness of projects," prior to making a loan. *See, e.g.*, 22 U.S.C. § 2191(a).

the loan was in compliance with all requirements, including underwriting standards." Pl. Resp. at 24.[15]

### iii.    The Court's Resolution.

The United States Court of Federal Claims does not have jurisdiction to adjudicate claims of promissory estoppel. *See Schuhl*, 3 Cl. Ct. at 210–11 ("[P]romissory estoppel claims are outside the scope of the Tucker Act[,] because the [Government] has not waived its sovereign immunity with regard to a promissory estoppel cause of action[.]") (citation omitted).

As to equitable estoppel, a complaint must allege sufficient facts to show:

(1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delated assertion of such right is permitted.

*Lincoln Logs*, 971 F.2d at 734.

But here, the court has determined that the December 3, 2013 Complaint does not allege sufficient facts to raise the claims of misrepresentation "above the speculative level." *Twombly*, 550 U.S. at 555. Instead, the alleged facts show that OPIC conducted due diligence and exercised its discretion not to proceed with the loan, as set forth in the September 29, 2011 Commitment Letter. As such, the December 3, 2013 Complaint does not allege the first element of equitable estoppel, *i.e.*, misleading conduct.

For these reasons, the court has determined that it does not have jurisdiction to adjudicate Count V of the December 3, 2013 Complaint. As such, Count V is dismissed. *See* RCFC 12(b)(1).

### d.    Count VII—Declaratory Relief.

### i.    The Government's Argument.

Finally, the Government argues that the December 3, 2013 Complaint does not "allege[] Count VII ['Declaratory Relief'] with sufficient specificity"; and, in any event, the court does not have jurisdiction to adjudicate a claim for declaratory relief. Gov't Mot. at 27.

Count VII seeks declaratory relief regarding alleged "'implied-in-fact' modifications to the Commitment Letter" involving a "legal fee agreement," but Count VII does not "explain what the 'legal fee agreement' is, or whether it is in the Commitment Letter, the 'implied-in-fact modifications,' or a separate agreement entirely." Gov't Mot. at 26. Therefore, Count VII should be dismissed for failure to state a claim, pursuant to RCFC 12(b)(6). Gov't Mot. at 27.

---

[15] It is unclear what actions the December 3, 2013 Complaint alleges invoke equitable estoppel. Instead, the December 3, 2013 Complaint only alleges the conclusion that "[t]he facts . . . give rise . . . to implied-in-fact equitable estoppel where Solaria relied upon them with knowledge of OPIC." Compl. ¶ 134.

In addition, the court does not have jurisdiction "to issue declaratory judgments [that] are not connected to claims for money damages" or that "do[] no more than duplicate the money damage relief sought in other counts of the complaint." Gov't Mot. at 27 (citing *Chevron U.S.A., Inc. v. United States*, 83 Fed. Cl. 209, 213 (2008) (stating that the court only can issue declaratory judgments that are "*tied and subordinate to a monetary award*") (emphasis in original); *see also Gentry v. United States*, 212 Ct. Cl. 1, 24 (1976) (same)). Instead of being "tied and subordinate to a monetary award," Count VII seeks a "declaratory judgment that implied in fact contracts were breached even though the other counts seek contract damages for alleged breaches of these same implied in fact contracts." Gov't Mot. at 28; *see also* Gov't Reply at 6–7 (same). Therefore, "Count VII simply duplicates the relief [the December 3, 2013 Complaint] seeks in Counts II and IV" and "must be dismissed for a failure of subject matter jurisdiction." Gov't Mot. at 28; Gov't Reply at 7 (same).

### ii.      Plaintiffs' Response.

Plaintiffs respond that "[i]n Count VII, [Plaintiffs] seek[] a declaratory ruling that the conditions for granting the loan have all been established, thusly establishing that [Plaintiffs are] entitled to a monetary award. Such a declaration would be 'tied and subordinate to a monetary award.'" Pl. Resp. at 22 (quoting *Austin v. United States*, 206 Ct. Cl. 719, 723 (1975), *cert. denied*, 423 U.S. 911).

### iii.      The Court's Resolution.

As a matter of law, because the United States Court of Federal Claims' jurisdiction is limited to monetary claims against the Government, the court "cannot grant non-monetary relief unless it is tied and subordinate to a monetary award." *Ford v. United States*, 899 F.2d 1228 (Fed. Cir. 1990) (citation omitted); *Gentry*, 212 Ct. Cl. at 24 (same). In this case, there is no "monetary award," because the court has determined that: the December 3, 2013 Complaint fails to state a claim for which relief can be granted as to Counts III, IV, VI, and VIII, pursuant to RCFC 12(b)(6); and the court does not have jurisdiction to adjudicate Counts I, II, and V of the December 3, 2013 Complaint, pursuant to RCFC 12(b)(1). Moreover, the December 3, 2013 Complaint has not adequately alleged that the "conditions for granting the loan have all been established" (Compl. ¶¶ 147–52; Pl. Resp. at 22), and OPIC provided adequate explanation for exercising its discretion not to proceed with the loan (Pl. Resp. Ex. B at 3).

For these reasons, the court has determined that it does not have jurisdiction to adjudicate Count VII of the December 3, 2013 Complaint. As such, Count VII is dismissed. *See* RCFC 12(b)(1).

**IV.     CONCLUSION.**

For these reasons, the Government's April 4, 2014 Motion to Dismiss is **granted**.  *See* RCFC 12(b)(1), 12(b)(6).  The Clerk is directed to dismiss the December 3, 2013 Complaint.

**IT IS SO ORDERED.**

<u>s/ Susan G. Braden</u>
**SUSAN G. BRADEN**
**Judge**
